1  MICHAEL S. SORGEN (SBN 43107)
   msorgen@sorgen.net
2  JOSHUA N. SONDHEIMER (SBN 152000)
   jsondheimer@sorgen.net
3  LAW OFFICES OF MICHAEL S. SORGEN
   240 Stockton Street, 9th Floor
4  San Francisco, California 94108
   Tel: (415) 956-1360
5  Fax: (415) 956-6342

6  Attorneys for Plaintiff

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  JENNIFER SAMSON DAVID,              CONSOLIDATED
                                        Case No. C 05-00046 CW
12              Plaintiff,

13       vs.                            **PLAINTIFF JENNIFER SAMSON
                                        DAVID'S OPPOSITION TO
14  CITY OF FREMONT, a municipal        DEFENDANTS' MOTION FOR
    corporation; CRAIG STECKLER,        SUMMARY JUDGMENT**
15  individually and in his capacity as Chief of
    Police for the City of Fremont; OFFICER
16  MICHAEL CHINN, individually; DOES 1-   Per Court's Order, hearing to be held only
    10, inclusive,                      upon Court's request
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

PLTFF. JENNIFER DAVID'S OPPOSITION TO DEFT'S MOTION FOR SUMMARY JUDGMENT
Case No. C 05-00046

# TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER OFFICER CHINN'S INITIAL RESPONSE AND USE OF FORCE WERE OBJECTIVELY UNREASONABLE AND VIOLATED GLENN DAVID'S FOURTH AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Officer Chinn's Response Went Beyond Mere "Bad Tactics" and Unreasonably Provoked the Confrontation with David . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Officer Chinn's Use of Force Was Objectively Unreasonable . . . . . . . . . . . . . . . 9

      C.    Officer Chinn is Not Entitled to Qualified Immunity . . . . . . . . . . . . . . . . . . . . . 12

IV.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER THE CITY AND CHIEF STECKLER MAY BE HELD LIABLE FOR CONDONING UNREASONABLE FORCE AGAINST EMOTIONALLY DISTURBED PERSONS, FOR RATIFYING OFFICER CHINN'S CONDUCT, AND FOR FAILING TO ADEQUATELY TRAIN FREMONT POLICE OFFICERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    Unofficial Custom or Policy of Deliberate Indifference . . . . . . . . . . . . . . . . . . . 15

      B.    Deliberate Indifference May Also Be Inferred from The Department's Commendation of Chinn's Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C.    The Department's Ratification of Officer Chinn's Conduct Independently Subjects the City to Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      D.    A Genuine Issue of Fact Exists as To Whether The Department's Inadequate Training Demonstrates Deliberate Indifference To Constitutional Rights . . . . . 21

      E.    Genuine Issues Exist as to Chief Steckler's Liability . . . . . . . . . . . . . . . . . . . . . 24

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994) . . . . . . . . . . . . 9

*Anderson v. Creighton*, 483 U.S. 645 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

*Buchanan v. City of Milwaukee*, 290 F.Supp.2d 954 (E.D. Wis. 2003) . . . . . . . . . . . . . . . 7, 10

*Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of Canton v. Harris*, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21, 23

*City of Los Angeles v. Heller,* 475 U.S. 796 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

 *Deorle v. Rutherford,* 272 F.3d 1272 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 13

*Doggett v. Perez*, 348 F.Supp.2d 1179 (E.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Graham v. O'Connor*, 490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Heller v. Bushey*, 759 F.2d 1371, 1375 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997), *amended*, 137 F.3d 1372 (1998) . . . 18

*Herrera v. Las Vegas Metropolitan Police Dept.*, 298 F.Supp.2d 1043 (D. Nev. 2004) . .   11, 12

*Ludwig v. Anderson*, 54 F.3d 465 (8th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*McRorie v. Shimoda*, 795 F.2d 780 (9th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . 14

*Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tennessee v. Garner*, 471 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATE CASES**

*Adams v. City of Fremont*, 68 Cal.App.4th 243 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

## I.      INTRODUCTION

Glenn David, recently remarried and father of two children, was needlessly shot and killed on February 18, 2004, by Fremont police officer Michael Chinn.  In responding to the call to come to David's assistance, Officer Chinn disregarded orders to wait for the arrival of a sergeant carrying a less-than-lethal weapon, and to "wait until we get ourselves set up" before seeking to engage David.  Instead he rushed alone to confront David.  Chinn's rash and deliberate action led inexorably to his brief and fatal interaction with David.  Officer Chinn's response violated his direct orders and Fremont Police Department guidelines for police response tactics.  His actions were directly contrary to all well-established principles for interacting with suicidal and emotionally disturbed individuals.  In light of the totality of circumstances, there is abundant evidence from which the trier of fact may conclude that Officer Chinn's shooting of David was objectively unreasonable.  Chinn's grossly reckless behavior, and the failures of command and control that permitted it, followed from an unofficial custom or policy within the Fremont Police Department of deliberate indifference to the rights of such persons.  This custom or policy are demonstrated by the Department's failure to address the high incidence of shootings by its officers, particularly of emotionally disturbed or suicidal persons, its approval and ratification of Officer Chinn's actions, and its failure to properly train its officers to handle calls concerning suicidal and emotionally disturbed individuals.  For these reasons, as fully set forth below, defendants' motion must be denied.[1]

## II.      STATEMENT OF FACTS

On February 18, 2004, decedent Glenn David was working into the evening at his workplace, GarrettCom, an electronics firm located in Fremont, California.  For reasons that remain unclear, at or about 8:00 p.m., David became distraught and cut himself in the abdomen with a knife, claiming that he was committing suicide.  An employee called 911 to ask for emergency assistance for David, and all other employees were evacuated from the building.  Employees left the building and stood outside in the parking lot, waiting for the arrival of medical

---

[1]  Plaintiff also joins in the Opposition by plaintiffs M.D. and Rachel David to Defendants' Motion for Summary Judgment.

1   personnel and the police.  David remained inside the GarrettCom building.

2           After receiving the 911 call, a Fremont Police Department ("Department") police

3   dispatcher alerted officers to respond to a suicidal individual carrying a knife in the GarrettCom

4   building.  The dispatcher alerted officers that "all other employees are outside." (Chinn Dep.

5   67:20-68:9).[2]

6           Officer Chinn was one of the officers who responded to the call.  Chinn had been hired as

7   a Fremont Police Officer in 2001, and had previously served as an officer with the City of

8   Alameda, serving as a member of its Special Weapons and Tactics ("SWAT") team.  (*Id.* at

9   10:25-11:3).  Chinn had applied to serve as a member of the Fremont Police Department's SWAT

10  team in or about 2003, but was not accepted.  (*Id.* at 22:16-24).

11          Officer Chinn's patrol supervisor issued instructions to officers over police radio Channel 1

12  as responding officers drove towards the GarrettCom building.  The last of the instructions

13  specifically related to how the officers should set up upon reaching the GarrettCom building.

14  Officers were instructed:  "**Let's just contain him for now until we get ourselves set up.**"

15  Shortly after, the officers were instructed:  "**Apparently he's inside the building.  Let's set up a**

16  **perimeter and wait for "less-than-lethal," then we'll go in.**" (Ex. 1 Fremont Police Radio

17  Channel 1 (CD Track 2) at 8:45 and 9:15)[3].  Officer Chinn disregarded these instructions, with

18  tragic results.

19          Dispatch continued to advise officers of developments as the officers approached the

20  GarrettCom facility.  Officer Chinn heard that an officer with a "pepperball gun" -- a non-lethal

21  device that shoots small plastic balls filled with pepper spray - was on its way, and understood

22  that a trained hostage negotiator had also been dispatched to the scene.  (*Id.* at 145:8 - 146:1).

23  Chinn learned over the radio while en route that David had cut himself on the wrists and stabbed

24  himself in the stomach.  (*Id.* at 74:2-6).  **Officers also were advised that David had not**

25  _____

26          [2] All deposition transcripts referenced herein are attached as Exhibits to the accompanying
27  Declaration of Joshua Sondheimer, in alphabetical order by the deponent's name.

28          [3] All references to Exhibits are to the Sondheimer Declaration, unless otherwise noted.

1  **threatened anyone.**  (Ex. 2 at 0210; Malcomson Dep. 81:5 - 82:3).

2        Officer William Malcomson was the first officer to arrive at the scene.  (Chinn Dep.

3  76:15-20).  Malcomson pulled into a driveway on the east side of the GarrettCom facility and

4  began to speak with two employees who approached him.  Malcomson was told that David was

5  inside the building and that all the employees were outside, and communicated this information

6  over his police radio.  (Malcomson Dep. 69:19-71:6; 73:10-13).

7        As Chinn arrived at the scene, he drove up behind Malcomson's car and saw him speaking

8  with the GarrettCom employees.  (Chinn Dep. 85:6-20).  After speaking briefly with the

9  employees, Malcomson got back into his vehicle and began driving up the east side of the

10  GarrettCom building towards the rear where David was believed to be.  (Malcomson Dep. 72:10-

11  73:10).  Chinn initially followed Malcomson in his vehicle towards the rear of the building.

12  (Chinn Dep. 89:24 - 90:11).

13        Malcomson stopped before reaching the back wall of the facility for "officer safety"

14  reasons, and began to exit his car.  He expected that Chinn would stop behind him, and intended

15  to discuss the situation with Chinn.  (Malcomson Dep. 80:4 -13; 138:1-139:1).  Under

16  Department "Protocol for Managing Critical Incidents," under which Officer Chinn and all

17  Fremont officers ostensibly were trained, the fact that Officer Malcomson arrived first on the

18  scene made him the temporary "incident commander," at least until a supervising officer arrived

19  and took control of the response.  (Ex. 3, at 2).  Under these guidelines, the first officer on scene

20  "is in control of the scene until relieved by a supervisor," and is responsible for collecting available

21  information and directing and coordinating the response of officers at the scene.  (*Id.* at 2).

22  Specifically:

23        The first officer on scene has the authority and the responsibility to control and dictate the
      response of additional responding units.  This includes setting of perimeters, initial

24        assignment upon arrival, establishing staging locations, and other tactical/strategic needs.
      [*Id.* at 3]

25        However, even as late as his deposition, Chinn remained unaware of any protocol as to

26  who is in charge among officers responding to an incident, asserting that:  "There is no specific

27  thing that says, you know, one particular officer is 'in charge' or not, unless, you know, an officer

28

PLTFF. JENNIFER DAVID'S OPPOSITION TO DEFT'S MOTION FOR SUMMARY JUDGMENT
Case No. C 05-00046                                  3

1 | assumes that position." (Chinn Dep. 77:15-78:2).

2 |      Contrary to Malcomson's expectations, Chinn did not stop behind him, but instead passed

3 | him and drove directly to the rear of the building. Chinn did not communicate his intentions in

4 | any way with Malcomson. (Chinn Dep. 89:25-91:20; Malcomson Dep. 80:4-13; 85:21-86:4;

5 | 87:3-8). Malcomson hurried back into his car and followed Chinn around to the rear of the

6 | building, parking behind Officer Chinn's vehicle. (*Id.;* Malcomson Dep. 83:13-84:4). Malcomson

7 | was concerned that he needed to cover Chinn, although he expected that Chinn, having arrived

8 | after Malcomson, would cover him. (*Id.* at 84:25-85:6; 85:21-86:4). Malcomson was

9 | "surprised" by Chinn's actions (Ex. 11 at 0485) but parked his car and moved "very quickly" to

10 | follow Chinn to the open back door, and arrived there just a few seconds after Chinn. (*Id.* at

11 | 87:18 - 88:1).

12 |      Malcomson had intended to try to talk to other employees who had congregated at the

13 | back of the building to gather further information for developing a response plan, and to discuss

14 | the situation with Chinn. However, Officer Chinn's actions forced Malcomson to abandon those

15 | plans. (Malcomson Dep. 111:22-112:15; 118:10-22; 138:1-139:1).

16 |      According to Chinn, as he stopped at the back of the building, he saw three employees

17 | walking away from the building, and asked them if David was still inside. Although Chinn

18 | professes to have been concerned about whether other employees were inside the building, he did

19 | not ask about that. (*Id.* at 88:15-23; 97:1-5).

20 |      Just before Chinn's arrival, GarrettCom employee Lance Deutscher had gone inside the

21 | building and attempted to speak with David, who was noncommunicative. Officer Chinn arrived

22 | at the back of the building and shined his spotlight on the open door just as Deutscher stepped

23 | outside of the building. ((Deutscher Dep. 49:20-24; 53:8-17). However, Chinn made no effort to

24 | communicate or gather information from him. (*Id.* at 61:11-13). Had Chinn done so he would

25 | have about David's nonthreatening, noncommunicative state and that no one else was in the

26 | building. (Deutscher Dep. 64:11-67:11).

27 |      Chinn turned his spotlight on the open back door and approached to the threshold of the

28 |

1   door.  (Chinn Dep. 109:4-11).  At this point in time, Chinn had **no information about David**

2   **having made any threat towards anyone else**.  (*Id.* at 110:7-14).  Chinn immediately saw

3   David, standing on the other end of the manufacturing facility, a distance Chinn estimated at

4   roughly 80 feet away.  Chinn took out his service revolver at this time and pointed it at David.

5   (*Id.* at 113:4-9; 116:22-117:20).

6         When Chinn looked inside the Garrettcom building, he saw that David was holding a knife

7   and bleeding from his abdomen and wrists.  (Chinn Dep. 142:4-13).  Although Chinn understood

8   that a negotiator was on the way, and officers had been advised of that over the police radio, Chinn

9   sought to engage David, once asking him his name, and then began repeatedly commanding David

10  to drop the knife.  (*Id.* at 120:23-121:8).  Chinn was standing exposed in the middle of the open

11  doorway.  (*Id.* at 125:4-8).  David was agitated and yelled to the officers, "Shoot me."  Chinn

12  could not understand anything else David said.  (*Id.* at 120:23 - 121:16).

13        Officer Malcomson radioed requests that "less than lethal" force be hurried to the scene.

14  According to Officers Chinn and Malcomson, David variously advanced towards and retreated

15  away from the officers.  (*Id.* at 120:10-22; Malcomson Dep. 143:22-144:11).  At one point, as

16  David allegedly was advancing, Officer Chinn fired two shots from his pistol.  One of the shots hit

17  David who soon collapsed to the ground.  (Chinn Dep. 153:1-16).  Although Malcomson was

18  providing cover for Chinn, he maintained his revolver at the "low ready" position throughout the

19  incident and did not shoot at David.  (Malcomson Dep. 94:1-3).

20        David was subdued by officers and eventually transported by ambulance to San Jose

21  Medical Center.  David was given emergency surgery but died in the operating room.  The county

22  coroner's office identified the cause of David's death as "gunshot wound of the abdomen."  (Ex. 4

23  at 000013).

24  **III.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER OFFICER**
        **CHINN'S INITIAL RESPONSE AND USE OF FORCE WERE OBJECTIVELY**
25      **UNREASONABLE AND VIOLATED GLENN DAVID'S FOURTH AMENDMENT**
        **RIGHTS**
26
27        To determine whether a police officer's actions violated the Fourth Amendment's

28  prohibition on unreasonable searches and seizures, the Court must examine whether the officer's

conduct was "objectively reasonable."  *Graham v. O'Connor*, 490 U.S. 386, 397 (1989).

### A.    Officer Chinn's Response Went Beyond Mere "Bad Tactics" and Unreasonably Provoked the Confrontation with David

Addressing situations in which an officers' conduct "provokes a violent response," the Ninth Circuit held in *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002), that "if an officer's provocative actions are objectively unreasonable under the Fourth Amendment . . . , *liability is established,* and the question becomes the scope of liability."  (Emphasis added).  An abundance of evidence would support the trier of fact in concluding that Officer Chinn unreasonably provoked the tragic and fatal confrontation with Glenn David.

Officer Chinn's aberrant and irresponsible handling of the situation went beyond the bounds of negligence and was "objectively unreasonable."  Acting as a "lone cowboy"–possibly seeking to demonstrate his credentials for the SWAT team position he was denied on his first application–Officer Chinn recklessly precipitated a confrontation with Glenn David.  Moments before Chinn confronted David, pointed his gun at him and started issuing commands, David was then not in a highly agitated state:  David's workmate, Lance Deutscher, had gone back into the building and attempted to engage David in conversation.  He  left David just moments before Chinn arrived and had found David to be non-responsive and at times looking like he was going to faint.  (Deutscher Dep. 42:2-11; 43:24-44:10; 47:3-9.)  **It is undisputed that David had not threatened anyone prior to the incident, and information to that effect was reported over the police radio prior to Officer Chinn's arrival.**

Chinn violated his own commander's orders and all precepts of well-established police practices for approaching and engaging disturbed or suicidal individuals.  (Ex. 5 at 11-19).  Chinn violated his own supervisor's orders to "set up" at the scene and wait for less than lethal force.  Instead, he rushed past Officer Malcomson without communicating in any way with Malcomson in order to coordinate a response.  These actions violated Chinn's own training with respect to Critical Incident Response, which required that he serve as a cover officer for Malcomson by virtue of Malcomson's having arrived at the scene, and to coordinate with and receive direction from Malcomson.  Officer Chinn also failed to gather any information from employees other than

1  David's location, and rushed to engage David alone, without cover, and without waiting for the

2  less than lethal force and a trained negotiator he knew were en route to the scene.

3       Guidelines and accepted practices for police officers approaching and engaging persons

4  who are emotionally disturbed or suicidal are well established.  See, e.g., *Buchanan v. City of*

5  *Milwaukee*, 290 F.Supp.2d 954, 960-61 (E.D. Wis. 2003) ("A great deal of information has long

6  been available to police officers concerning how to interact with persons who are emotionally

7  disturbed.").  These guidelines are reflected in a one-time training on "Suicide in Progress/Suicide

8  by Cop" provided by the Department to officers in 1999.  (Ex. 6).  Guidelines included in the

9  training, and the ways in which Chinn failed so completely to follow them, are identified below:

| **GUIDELINES** (Verbatim) (Ex. 6 at 1257, 1269-76): | **OFFICER CHINN'S ACTIONS** |
|---|---|
| SIMPLY STATED, STOP, LOOK, AND LISTEN | Failed to gather information from witnesses, and rushed to engage David after already learning that David was inside building |
| DON'T RUSH THE SITUATION | Rushed to engage David |
| DON'T PRECIPITATE THE CONFLICT...DON'T BECOME A TARGET | Immediately drew and aimed weapon at David while David approximately 80 feet away, and began issuing repeated commands; stood in exposed position in doorway without cover |
| MAINTAIN COVER | Stood in exposed doorway without cover |
| NO HEROIC ACTIONS | Rushed past Malcomson to engage David alone, without communicating plans or intentions |
| MAINTAIN DISCIPLINE FOR A CONTROLLED CONTACT WITH THE SUBJECT | Failed to follow established guidelines for coordinated response to critical incident |
| DO NOT PROVOKE THE SITUATION. . . . | Immediately drew and aimed weapon at David while David approximately 80 feet away, and began issuing repeated commands |
| **Additional "Do's" and "Don't's" Identified in the Training not reflected above Include**: | |
| ESTABLISH INCIDENT COMMANDER | Failed to communicate or coordinate with Malcomson, incident commander under Department policies |

| | |
|---|---|
| CONTAIN AND EVACUATE | Failed to wait until perimeter established before approach (see below) |
| DEVELOP A 2-COMPONENT PLAN: VERBAL (MENTAL) INTERVENTION, TACTICAL INTERVENTION (IF POSSIBLE) | Failed to wait until plan established |
| COLLECT ALL AVAILABLE INFORMATION ABOUT PATIENT BEFORE APPROACH...NO NEED TO RUSH | Failed to communicate with Malcomson or witnesses before approach |
| FULLY DISCUSS AND REVIEW ALL ASPECTS OF THE PLAN | Failed to wait for a plan |
| IF/WHEN APPROACH IS APPROPRIATE, ALWAYS IN PAIRS | Approached David alone |
| DON'T DEMAND CONTROL FROM THE PATIENT . . TRUST AND SURRENDER TAKES TIME | Immediately began demanding control from David |

**"Techniques" Identified Include**:

| | |
|---|---|
| STAY TOGETHER | Acted alone |
| CALL SUSPECT OUT OF HOUSE OR HAVE DESK CALL BACK TO LOCATION AND HAVE SUSPECT STEP OUT | Sought to engage David inside GarrettCom building |
| AVOID ENTERING HOME | Sought to engage David inside GarrettCom building |

Officer Chinn's actions, so directly contrary to basic police practices, recklessly provoked the confrontation with an obviously emotionally disturbed and suicidal individual, and left deadly force as the only option. Under the circumstances, Officer Chinn's provocation of the violent incident was objectively *un*reasonable, and Officer Chinn's liability for the resulting shooting of David "is established." *Billington*, 292 F.3d at 1190. A reasonable officer would have anticipated that an emotionally disturbed individual such as David would be non-compliant with commands: The City's training on handling emotionally disturbed individuals anticipates a likelihood that a suicidal subject will be noncompliant with commands and try to create a confrontation. (Nelson Dep. 168:19-169:20; 178:22-179:5; Clark Report, Ex. 5, at 11-14). Officer Chinn failed to follow recommended procedures specifically designed to minimize the likelihood of using force in any such confrontation. Thus, there is sufficient evidence for a jury to conclude that Officer Chinn's reckless and objectively unreasonable conduct were a proximate cause of his death.

1    Where an officer "intentionally or recklessly provokes a violent response, the provocation
2    is an independent constitutional violation.  That provocation may also render the officer's
3    otherwise "defensive" use of force unreasonable as a matter of law.  *Billington*, 292 F.3d at
4    1190-91.  Officer Chinn pointed his loaded pistol at David, who was obviously emotionally
5    distraught and who Chinn knew was suicidal and had not threatened anyone else.  These actions
6    are sufficient to constitute an independent Fourth Amendment violation.  *See Robinson v. Solano*
7    *County*, 278 F.3d 1007, 1013-14 (9th Cir. 2002) (officer's drawing weapon on suspect who had
8    shot two dogs but did not pose threat to others at time and was not resisting arrest violated Fourth
9    amendment); *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994).  In
10   *Alexander*, officers forcibly entered the home of Henry Quade, who was mentally ill and had
11   refused entry to health inspectors.  Quade had declared he would shoot anyone who tried to enter
12   his home.  *Id.* at 1357-58.  The officers shot Quade as he attempted to shoot at them.  *Id.* at 1358.
13   The Ninth Circuit held that if police used unreasonable force in entering home, they may be liable
14   for using excessive force even if they reasonably shot Quade at the moment of the shooting.  *Id.* at
15   1366-67.

16   Similarly, ample evidence exists for the trier of fact to conclude that Officer Chinn's
17   conduct led to his violent confrontation with David.  Thus, Officer Chinn may be liable regardless
18   of whether it finds that Officer Chinn's use of deadly force was defensive at the moment of the
19   shooting.

20   **B.    Officer Chinn's Use of Force Was Objectively Unreasonable**

21   The reasonableness of the force used to effect a particular seizure is determined by
22   "careful[ly] balancing . . . 'the nature and quality of the intrusion on the individual's Fourth
23   Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490
24   U.S. at 396 (internal quotation omitted).  Officer Chinn shot David, and the result was fatal.  A
25   seizure by deadly force is subject to the Fourth Amendment and its intrusiveness is "unmatched."
26   *Tennessee v. Garner*, 471 U.S. 1, 7, 9 (1985).

27   On the other hand, the government interests at stake are weak.  To evaluate the

28

PLTFF. JENNIFER DAVID'S OPPOSITION TO DEFT'S MOTION FOR SUMMARY JUDGMENT
Case No. C 05-00046                        9

government interests involved in an officer's use of force, the Court must look to factors that include: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate theat to the safety of the officers or others, (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight; and (4) any other exigent circumstances existing at the time. *Deorle v. Rutherford,* 272 F.3d at 2180 (9th Cir. 2001).

The Ninth Circuit has made clear that in weighing the competing interests of the victim and government, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed." *Id.* at 1283.  As the Court noted:

> Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the government interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

*Id.*  A number of other courts have held to the same effect.  *See, e.g., Buchanan*, 290 F.Supp.2d at 960-61 (relevant factor in determining reasonableness of force is whether officer "knew or should have known that plaintiff was mentally ill and, if so, whether he followed generally accepted police practices applicable to encounters with such persons); *Palmquist v. Selvik*, 111 F.3d 1332, 1340-41 (7th Cir. 1997) (indicating that an officer's awareness of an emotionally disturbed person's suicidal motivation might have a bearing on what tactics and level of force are reasonable); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir.1995) (stating that mental state of an emotionally disturbed person is relevant in assessing the reasonableness of an officer's use of deadly force).

Here, it was apparent before and upon Officer Chinn's arrival that David was emotionally disturbed. **Glenn David had committed no crime, was not a criminal suspect, and was not being sought for arrest.  The officers had been advised repeatedly that David had not threatened anyone other than himself.**  When Officer Chinn first observed David, he was by Chinn's estimate some 80-90 feet away and did not pose an immediate threat to Chinn's safety. Even as David approached, he never held the knife over his head in a throwing position and never ran towards the officers.  (Chinn Dep. 150:4-7).  David was not resisting arrest or attempting to flee.

1    There were no exigent circumstances that warranted Officer Chinn's haste to locate David.

2    He had repeatedly just been advised that David was inside the building, and had been ordered to

3    wait for less than lethal force to arrive before attempting to encounter David.  Indeed, Chinn had

4    been specifically instructed to just contain David until the officers could get themselves set up, and

5    to await for less than lethal force before approaching David.  Considering all the circumstances and

6    options available to Officer Chinn, any threat posed by David to the officers could readily have

7    been avoided.  (Clark Report, Ex. 5, at 15-17 ("all Officer Chin had to do to avoid a confrontation

8    was to withdraw, shut the door and maintain containment as ordered")). Officer Chinn's

9    knowledge that less than lethal force and a trained negotiator were en route to the scene – called

10   for patience and efforts by the officers to avoid consummating David's irrational request for

11   Officer Chinn to shoot him. "When the person seized is not a 'suspect,' has committed no crime

12   when the police approach, and is provoked by police escalation of the situation, the 'importance of

13   the governmental interests alleged to justify the intrusion' is necessarily diminished." *Ludwig*,

14   *supra,* 54 F.3d at 471.

15   At least, a genuine issue exists as whether the force used by Officer Chinn was

16   unreasonable.  See *Deorle*, 272 F.3d at 1284-85 (even less than lethal force used against

17   emotionally disturbed individual who had not threatened others, and where team of negotiators

18   was en route, violated individual's Fourth Amendment rights); *Herrera v. Las Vegas Metropolitan*

19   *Police Dept.*, 298 F.Supp.2d 1043, 1051 (D. Nev. 2004) (use of deadly force against obviously

20   emotional and disturbed individual unreasonable given that officers took "confrontive approach"

21   and did not retreat when it became clear that victim was becoming more agitated).

22   In *Herrera*, as here, officers shot and killed an emotionally disturbed man who refused to

23   yield to their instructions to drop a paring knife and who, according to the officers, moved towards

24   them from within 10-15 feet, posing a "serious threat" to their safety.  298 F.Supp.2d at 1047-48,

25   1050.  The court denied summary judgment.  The court noted that the decedent Herrera was "not

26   approached by police due to any criminal activity."  *Id.* at 1051.  Similarly to David, Herrera's

27   resistance was "due entirely to his delusional state rather than any reasoned recalcitrance on his

28

1    part." *Id.*  Herrera was in his family home and no one else was inside, leading the court to

2    conclude there was "no evidence of exigent circumstances warranting the haste with which the

3    Metro officers pursued this situation." *Id.*  The Court concluded:

> At the time of his interaction with the police, Herrera was in a severely emotional
> mental state. This was clear to the officers not only from the information they
> received upon their arrival, but also during the course of their interaction with
> Herrera. Yet, the officers took a confrontive approach with Herrera and did not
> retreat or reconsider that approach, even when it was clear that Herrera was
> becoming more agitated. In light of the disputed facts, and the fact that this
> confrontation resulted in the death of an individual whom Metro officers were
> aware was mentally incompetent, this Court cannot rule out liability on the part of
> [the officers] for any improper action or supervision during the confrontation.

9    *Id.*

10        **C.      Officer Chinn is Not Entitled to Qualified Immunity**

11           In determining whether qualified immunity applies, the Court must determine whether it

12   would be "'clear to a reasonable officer that his conduct was unlawful in the situation he

13   confronted.'" *Deorle*, 272 F.2d at 1285 (quoting *Saucier v. Katz*, [533 U.S. 194], 121 S.Ct. 2151,

14   2156 (2001)).

15           Plaintiffs have demonstrated "clear authority" that prohibited Officer Chinn from

16   responding in the manner he did and shooting Glenn David under the specific circumstances

17   presented by the incident.  Moreover, the Supreme Court has rejected the notion that officer

18   liability cannot exist "unless the very action in question has previously been held unlawful."

19   *Anderson v. Creighton*, 483 U.S. 645, 640 (1987)  (qualified immunity not warranted if, in light of

20   pre-existing law, the unlawfulness of the officer's actions is apparent.)

21           An officer will be entitled to qualified immunity only if he made a "reasonable mistake[] as

22   to the legality of [his] actions." *Deorle*, 272 F.3d at 1285.  In *Deorle*, police were called by

23   Deorle's wife, who reported that he had become suicidal, and had "lost control of himself." *Id.* at

24   1275-76.  At least 13 officers responded to the scene,  set up roadblocks and awaited the arrival of

25   a Special Incident Response Team and a team of trained negotiators. *Id.* at 1276.  At one point,

26   Deorle shouted "kill me" and brandished a hatchet at an officer. *Id.*  One of the officers,

27   Rutherford, moved closer to Deorle, and observed him carrying an unloaded crossbow in one

28

1    hand, and what may have been a can or a bottle of lighter fluid.  *Id.* at 1277.  Deorle threatened to

2    "kick [Rutherford's ass]," but put down the crossbow at Rutherford's request.  *Id.*  At one point,

3    Deorle began to approach Rutherford at a steady gait, still holding the bottle or can.  When he

4    reached a certain point, Rutherford shot Deorle with a lead-filled "beanbag round."  *Id.* at 1278.

5    The shot hit Deorle in the face, removing one of his eyes and causing skull fractures.  The Ninth

6    Circuit reversed summary judgment, finding that Rutherford was not entitled to qualified immunity

7    for his use of less than lethal force against Deorle.  The Court held that: "It should have been clear

8    to any reasonable officer that, under the circumstances present, firing at Deorle was objectively

9    unreasonable."  *Id.* at 1285.  Supporting its holding, the Court noted that Deorle had committed no

10   offense, was emotionally disturbed, and did not pose an objectively reasonable threat to the safety

11   of the officer or other individuals.  The Court also found it pertinent that "a team of negotiators

12   essential to resolving such situations was en route."  *Id.*

13          Here too, Officer Chinn used deadly force against an obviously emotionally disturbed

14   person and the officer's own actions provoked the confrontation.  It would have been apparent to

15   a reasonable officers that using deadly force against David was unlawful.  See *Deorle*, 272 F.3d at

16   1285-86.  Officer Chinn's alleged belief that he needed to shoot David to protect his safety was not

17   objectively reasonable.  His duty was to make a tactical retreat and use deadly force only with the

18   utmost care and restraint.  (Clark Report, Ex. 5, at 15-16).  As plaintiffs' expert Roger Clark

19   observes, Officer Chinn "demanded (and expected) that Mr. David act rationally.  This is clearly

20   contrary to the basic tactics required in dealing with impaired and possibly mentally ill individuals."

21   (*Id.* at 14).  Officer Chinn did not make a "reasonable mistake" as to the legality of his actions.

22   *Deorle,* 272 F.3d at 1285.  Rather, he placed responsibility for the outcome of the confrontation

23   solely on David despite knowing that the victim was not acting rationally.  As Officer Chinn stated:

24          4    Q.    Okay.  So there is nothing, in your

25          5    opinion, that you could have done to avoid killing

26          6    Glenn David.

27          7    A.    Maybe if I had asked him one more time to

28

1      8  drop the knife, and he did it, then, yeah, that would

2      9  have precipitated me from shooting him.

3      10      Q.   **So it was all up to him.**

4      11      A.   **That's correct.**

5      12      Q.   But if he was suicidal, and wanted your

6      13  help in consummating the suicide, then, he was going to

7      14  get it, right?

8      15      A.   Yes.

9   (Chinn Dep. 199:4-15).

10          The unlawfulness of Officer Chinn's shooting of David was apparent.  Chinn is not entitled

11   to qualified immunity.

12   **IV.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER THE CITY
          AND CHIEF STECKLER MAY BE HELD LIABLE FOR CONDONING**

13   **UNREASONABLE FORCE AGAINST EMOTIONALLY DISTURBED PERSONS,
          FOR RATIFYING OFFICER CHINN'S CONDUCT, AND FOR FAILING TO**

14   **ADEQUATELY TRAIN FREMONT POLICE OFFICERS**

15          Genuine issues of material fact exist as to whether the shooting of David resulted from the

16   City's custom of acquiescing in unreasonable use of force by Fremont police officers, the City's

17   deliberate indifference to the rights of emotionally disturbed persons with whom its officers come

18   into contact, and the ratification by police officials of Officer Chinn's violation of David's

19   constitutional rights.  A public entity is liable when it commits or condones constitutional

20   violations pursuant to the entity's policy or custom, *Monell v. Department of Social Services*, 436

21   U.S. 658, 690-92 (1978), or due to inadequate training, supervision, or discipline rising to the level

22   of deliberate indifference. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

23

24   **A.      Unofficial Custom or Policy of Deliberate Indifference**

25          Here, the City of Fremont demonstrated its custom of acquiescing in or condoning

26   unconstitutional conduct by failing to take any special action to investigate or provide

27   supplemental training in response to a high number of officer-involved shootings – largely of

28

1    mentally disturbed individuals -- and by ratifying Officer Chinn's unreasonable and unnecessary

2    shooting of Glenn David.

3        Since 1992, Fremont police officers have been  involved in at least twelve officer-involved

4    shootings, at least half of which involved emotionally disturbed individuals.  (Ex. 7).  In nine of the

5    incidents, the suspects died or were injured by the police; in two the suspects died of self-inflicted

6    injury.  Following the shooting of Glenn David, Fremont officers were involved in at least two

7    additional shootings, one resulting in the subject's death, the other wounding the subject.  Five

8    incidents, including the killing of Glenn David, occurred within the span of just two years. (*Id.*).

9        An incident in 1993 is the subject of a reported California decision, *Adams v. City of*

10   *Fremont*, 68 Cal.App.4th 243 (1998). Fremont police officers shot Patrick Adams, who had been

11   threatening suicide with a firearm.  Officers had been called to Adams' home after his wife called

12   911 concerned that he might have shot himself.  Officers located Adams in the backyard of his

13   home, armed with a handgun which he kept pointed to his chest.  Various officers attempted to

14   negotiate with Adams and get him to throw out the gun.  At one point, officers surrounding the

15   scene heard a gunshot and fired at Adams, apparently believing he had fired at them.  Adams

16   suffered numerous bullet wounds, one of which apparently was from his own weapon, and his

17   death was attributed primarily to the self-inflicted wound.  *Id.*, 68 Cal.App.4th at 249-55.

18       The jury heard testimony from numerous officers at the scene and from expert witnesses on

19   police practices.  *Id.*  The jury determined that the responding officers negligently caused Adams'

20   death, and issued a $4 million verdict against defendants.  In support of its verdict of negligence,

21   the jury issued special findings of fact which chillingly resemble the officers' and Department's

22   failures here.  The jury's findings included:

         (1) "Lacked control of the officers";
23       (2) "Insufficient communications";
         (3) "Lack of information";
24       (4) "Did not respond to suicide call as such. It was an assault response rather than
         assist";
25       (5) "Did not follow Fremont Police Dep[artment] procedures for dealing with a
         critical incident"; . . .
26       (8) "Allowed untrained officer to attempt negotiation"; . . .
         (11) "The use of [seven] armed officers left no option but force";
27       (12) "Once location of [Adams] was known, did not back down to allow calming of
28

1    situation"; and

2    *Id.,* 68 Cal.App.4th at 205.

3    The jury's striking findings necessarily put the Department on notice that it needed to take

4    remedial measures to help avoid any recurrence of similar tragic incidents.  However, the

5    Department provided no focused training on handling emotionally disturbed or suicidal persons

6    until six years after the incident.  ( Ex. 8 at 8-9 (Response to Interrogatory No. 8); see Lucero

7    Dep. 49:24-50:3).  Fremont police Captain Richard Lucero, a Department veteran since 1987 who

8    played an "important" role in Department training since 1995, testified that he was unaware of any

9    discipline against Fremont officers in connection with the Adams incident.  (Lucero Dep. 15:13-15,

10   58:16-21, 150:13-151:2).  The City did, however, contest the verdict.  On appeal, the Court of

11   Appeal reversed the judgment against the officers on the sole ground that the officers "owed no

12   duty of care" to take reasonable steps to prevent Adams from committing suicide.  *Adams*, 68

13   Cal.App.4th at 264-89.

14   Indeed, the Fremont Police Department has not disciplined *any* of its officers in connection

15   with its officer-involved shootings (Lucero Dep. 150:19-151:15, 155:1-4).  Captain Lucero is also

16   unaware of any changes in policy that resulted from these incidents.  (*Id.* at 152:16-25, 155:2-5).

17   At least since 2002, the Department has never referred any of the shooting incidents to its Internal

18   Affairs Division for investigative review.  (Nelson Dep.  53:12-54:13).  Captain Lucero testified

19   that he was unaware of any discussions within the Department about the possible causes of the

20   occurrence of five shooting incidents in the two years between September 2003 and 2005,

21   including the killing of Glenn David, or of any discussion about the heightened frequency of

22   incidents during this period as a "problem."  (*Id.* at 65:3-17; 66:19-25).  The Department's failure

23   to identify any need for training reinforcement before or after this spate of incidents (*Id.* at 58:23-

24   59:11)  to avoid further civilian deaths falls below accepted professional standards, regardless of

25   whether the shootings were "within policy,"  and demonstrate a departmental culture of disregard

26   for the gravity of shootings of civilians by its police officers.  (See Clark Report, Ex. 5, at 2, 16).

27   In 2002, the Department instituted a procedure for convening "Training Review Boards" to

28

1   review certain types of incidents, including officer-involved shootings, "for training purposes."

2   (Ex. 9, § 1).  The policy provides that its purpose is to "lead to the improvement of our training

3   programs," but not for the purpose of "administrative review leading to punitive action for the

4   employee's actions."  (*Id.* § 2).  Indeed, if suspected violations of "law, rules, policies, or

5   procedures" are discovered, the policy requires that the Review Board "immediately cease its

6   inquiry" and refer the matter to the Department's internal affairs division for disciplinary

7   investigation.  (*Id.*).  Since the creation of the review board policy, none of the four training review

8   boards convened in response to police shootings, including the Department's review of Chinn's

9   killing of Glenn David, have been suspended for referral to internal affairs.  (Nelson Dep. 53:12-

10  54:13, 57:7-13).

11      Command and control failures in the Department's response during the incident also

12  demonstrate a Departmental culture of deliberate indifference.  As plaintiffs' expert Roger Clark

13  notes, it should have been apparent to Malcomson that he should intercede with Chinn to order

14  Chinn to withdraw.  (Ex. 5 at 11).  Moreover, Watch Commander Sergeant Gott failed to ensure

15  Chinn's compliance with the instruction to wait for less lethal force after containing David.   The

16  lack of clear and resolute direction to the officers also demonstrates an underlying policy of

17  tolerance for unnecessary shootings of emotionally disturbed individuals, as happened here.  (*Id.* at

18  10, 16-17).

19      **B.      Deliberate Indifference May Also Be Inferred from The Department's
             Commendation of Chinn's Conduct**

20      The response of policymakers to an incident "is not only admissible for purposes of proving

21  a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry."

22  *Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997), *amended*, 137 F.3d 1372 (1998).  When

23  a municipal defendant "continues to turn a blind eye to severe violations of inmates' constitutional

24  rights--despite having received notice of such violations--a rational fact finder may properly infer

25  the existence of a previous policy or custom of deliberate indifference." *Id.*, 137 F.3d 1372.  In

26  *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir.1986), the Ninth Circuit specifically held that;

27      Policy or custom may be inferred if, after [the alleged violations], . . . officials took

28

PLTFF. JENNIFER DAVID'S OPPOSITION TO DEFT'S MOTION FOR SUMMARY JUDGMENT
Case No. C 05-00046                        17

no steps to reprimand or discharge the[ir subordinates], or if they otherwise failed to admit the [subordinates'] conduct was in error. [citation omitted]

*See also Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985) ("subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy").

Here, the Department's response and review of Chinn's killing of Glenn David and the Department's command and control response to the incident demonstrates the existence of a condoned custom of accepting dangerous recklessness on the part of its officers.  Despite Officer Chinn's egregious disregard of the Department's policies, guidelines, and training in his response at the scene, responsible Department officials never discussed the possibility that Chinn's conduct warranted referral to internal affairs for discipline.  (Lucero Dep. 82:13 - 83:1).

At Captain Lucero's request, the Department instead convened a Training Review Board, ostensibly to review the conduct of Officer Chinn and other officers for purposes of improving training.  However, the outcome of the review was effectively predetermined, and the Board's report amounted to a "whitewash" of Chinn's and others' reckless response.  In requesting that Fremont Police Captain Nelson convene a Training Review Board, Captain Lucero wrote to that Officer Chinn "made a necessary and appropriate decision to discharge his firearm."  (Ex. 10).  Yet, Captains Lucero and Nelson had already agreed that Chinn's conduct was "necessary and appropriate."  (Nelson Depo. at 88:14-89:18).

The Review Board consisted of Captain Nelson, Sergeant Dauzat–coordinator of the Department's Training Unit, and three "subject matter experts."  (Ex. 11).  Their analysis was based on a review of the available documentation -- apparently the Department's own report -- and oral testimony of police officers involved.  The report does identify some of the aspects of Office Chinn's reckless response:  For example, the report:

1. Confirms that Officer Malcomson was surprised when Officer Chinn drove past him to get to the rear of the building;

2. States that Chinn never discussed with Malcomson, who was the incident commander by virtue of his being the first officer on the scene, that he intended to drive to the rear of the building and approach the rear doorway;

3.   Notes that Chinn believed the situation warranted an immediate response because it was was similar to an "active shooter" situation, but that "[b]ased upon information received and broadcast to the officers on the scene, the incident had not risen to the level of an active shooter tactical response";

4.   Observes that it "may have been prudent" for an emergency response team, optimally comprised of a sergeant and 3 to 5 officers, to approach the open doorway and assess the situation after a perimeter had been established;

5.   Notes that Chinn "approached the open rear door by himself and was unaware of the locations of his fellow officers;"

6.   Notes that by moving into the center of the rear doorway, Chinn "unnecessarily expose[d] himself to engage David;"

7.   Notes that Chinn "immediately began giving commands to David while he held him at gunpoint."

(Ex. 11 at 0485).

Notwithstanding these observations of Officer Chinn's violations of Department training and guidelines, the Board disregarded Chinn's failure to follow the instruction issued by radio to all officers to "just contain him for now until we get ourselves set up," and to "set up a perimeter and wait for less than lethal -- then we'll go in."  (Ex. 1).  The Review Board even concluded that the officers did an "admirable job" in dealing with the situation, and that "all of the officers associated with this incident acted in a professional manner and within departmental policy."  (*Id.* at 0486-87).

Captain Nelson concluded that the response demonstrated "no obvious deficiencies that we were concerned about that warranted any kind of special training."  (Nelson Dep. 116:5-117:2). The Board recommended no special training for Officer Chinn, and only "refresher training" with respect to tactical response planning, team movement, and less lethal deployment.  The report concluded that the Department's regular ongoing training, such as a Critical Incident Response Training offered in November 2003, would continue to prepare officers to confront similar incidents.  (Ex. 11 at 0486-87).  The Board did not recommend further training, such as the 1999 training focused on handling emotionally disturbed and suicidal individuals, and never referred to the Department's own training bulletin on "Suicide by Cop." (*Id.*).

The Department's conclusions and recommendations amount to a "whitewash" of the obvious failings of Officer Chinn and the other officers and supervisors involved in this incident.

1   The failings were well below the applicable standards of care.  (Clark Report, Ex. 5).  Thus, the

2   Department's commendation of the officers, and its failure to acknowledge the need for special

3   training on handling situations regularly encountered by its officers that have repeatedly resulted in

4   the loss of life, raise an inference sufficient to support the trier of fact in finding that the

5   Department maintained a custom or policy of deliberate indifference.

6   ## C.   The Department's Ratification of Officer Chinn's Conduct Independently Subjects the City to Liability

7
8   The Department's approval of Officer Chinn's objectively unreasonable use of deadly force

    against Glenn David independently raises a genuine issue of fact as to the City's liability.  A

9   municipality may be held liable when "'authorized policymakers approve a subordinate's decision

10  and the basis for it.'"  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999), *quoting City of St.*

11  *Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  Despite, the relevant officials must have

12  knowledge of the alleged constitutional violation, they made a "conscious, affirmative choice" to

13  approve it.

14  Under the Department's Training Review Board policy, the Board was duly delegated

15  authority to make findings and conclusions following the incident.  (Ex. 9).  The Board's

16  conclusions that Officer Chinn did an "admirable job" and that he "acted in a professional manner

17  and within departmental policy" knowingly affirmed Officer Chinn's unconstitutional conduct and

18  his asserted reasons for his conduct.  The report as issued by the Board remains final,

19  demonstrating Chief Steckler's acceptance of its conclusions and his ratification of Chinn's conduct

20  as the City's primary police official.  (Nelson Dep. 90:24-91:2)

21

22  ## D.   A Genuine Issue of Fact Exists as To Whether The Department's Inadequate Training Demonstrates Deliberate Indifference To Constitutional Rights

23
24  A municipality may be held liable for failing to adequately train its police officers where the

    failure to train "amounts to deliberate indifference to the rights of persons with whom the police

25  come into contact."  *Canton* , 489 U.S. at 388.  In evaluating a city's liability for inadequate

26  training, "the focus must be on adequacy of the training program in relation to the tasks the

27  particular officers must perform."  *Canton*, 489 U.S. at 390.  As one court noted, citing *Canton*,

28

1   "Deliberate indifference may be established by demonstrating a failure to train officers "in a specific

2   area where there is an obvious need for training in order to avoid violations of citizens'

3   constitutional rights." *Doggett v. Perez,* 348 F.Supp.2d 1179, 1193 (E.D. Wash. 2004).

4            Fremont police officers were called upon frequently to respond to situations involving

5   emotionally disturbed individuals, including the mentally ill and individuals who have become

6   suicidal.  (See Dauzat Dep. 35:16-19; Malcomson Dep. 47:14-48:6; See also Clark Report, Ex. 5,

7   at 12).  Particularly in light of the commonality of such interactions, and their potential for violent

8   confrontation, the Department was under a heightened duty to ensure that its officers were

9   adequately trained to respond without leaving deadly force as the only option to subdue

10  "threatening behavior" by such persons.

11           Here, a specific pattern of incidents involving the use of deadly force against emotionally

12  disturbed individuals demonstrates the City's failings.  Between 1992 and 1999, there were at least

13  four separate incidents in which Fremont officers used deadly force against emotionally disturbed

14  individuals.  (Ex. 7).  In 1999, the Department held two trainings dedicated to handling situations

15  involving mentally ill and suicidal persons.  The first of these, which focused on suicide

16  intervention and the problem of "Suicide by Cop," was a six-hour course held on or about May 18,

17  1999, and led by Dr. Barry Perrou, a psychologist and Sergeant with the Los Angeles Sheriff's

18  Department.  (Ex. 6) ("Perrou training").  The second, entitled "Police Handling of the Mentally

19  Ill," was half-day course led by defense counsel in this matter, Gregory Fox, on or about December

20  8, 1999.  (Ex. 12).

21           The trainings provide important guidance and recommendations regarding handling

22  mentally ill and suicidal persons.  The Perrou training included background on suicide, and training

23  on "crisis intervention and tactical response considerations," and "suicide by cop."  As noted

24  earlier, the training provided critical written guidance on tactical considerations for responding to

25  and intervening with suicidal persons – virtually all of which Officer Chinn violated in his response

26  to Glenn David.  (Ex. 6).  The Fox training similarly provided background on the "history of police

27  handling of the mentally ill," "recognizing the mentally ill," "police response to the mentally ill,"

28

1    the latter focusing on tactical considerations.  Both trainings emphasized the importance of

2    avoiding rushing the situation, making a controlled contact with the subject, not  displaying arms

3    or making demands, minimizing the possibilities for threats to be made against the officer (e.g.,

4    maintaining cover), and recognizing that the subject is not likely to behave or respond rationally.

5    (Exs. 6, 12).  Unfortunately, Officer Chinn had not yet been hired with the Fremont Police

6    Department at the time of these courses.

7            These special training courses had a beneficial effect initially.  While Fremont police

8    officers had been involved in six shootings prior to the 1999 trainings, including at least four

9    involving emotionally disturbed or suicidal individuals, there were *no* officer-involved shooting

10   incidents during a three-and-a-half year period following the 1999 trainings.  The next shooting

11   incident  occurred in August 2002.  (Ex. 7).

12           The Department failed, however, to ensure that the critical trainings on this issue were

13   provided to newly-hired officers, or reinforced with existing officers.  Neither of the courses, or

14   related training regarding responding to mentally ill and suicidal individuals, was offered within the

15   next six years.  (Nelson Dep. 145:13-146:4; 91:18-92:17).  Although a course on "Critical Incident

16   Response" provided in November 2003 included some "table-top" and role-play exercises

17   involving emotionally disturbed individuals, these trainings were not focused on and did not

18   emphasize the special considerations involved in the Perrou and Fox trainings for handling

19   emotionally disturbed and suicidal persons.  (*Id.*, 145:13-146:4).

20           Based on the Perrou training, the Department issued a Training Bulletin to officers in July

21   1999 on responding to Suicide by Cop situations.  (Ex. 13).  The training bulletin incorporated key

22   points from the Perrou training, reflecting the Department's view that it was a "good training."

23   (Lucero Dep. 126:5-10).  However, the Bulletin did little more than collect dust after it was issued.

24   (Dauzat Dep. 48:9-16; 51f:15-52:5).  This despite the fact that Captain Lucero, who has played a

25   key role in the Department's training efforts, recognized training on mentally ill and suicidal

26   individuals as a "critical topic."  (Lucero Dep. 132:2-17).  Tellingly, the shooting of Glenn David

27   was not discussed or reviewed in *any* training provided by the Department.  (Lucero Dep. 91:18-

28

1   93:2).

2          The Department's failure to follow through on training on the "critical topic" of handling

3   mentally ill and suicidal individuals had dramatic results.  While the 1999 trainings led to a three-

4   and-a-half year period of *no* officer involved shootings, by 2002, shootings were again occurring.

5   Between September 2003 and September 2005, Fremont officers fired at human beings at least five

6   times, including Officer Chinn's shooting of Glenn David.  As plaintiffs' expert Clark testifies,

7   focused training to avoid situations leading to a resort to deadly force have and can be successful.

8   (Clark Report, Ex. 5, at 4). The Department's failure to ensure that all its officers were properly

9   trained on responses to emotionally disturbed persons and its impact on the numbers of shootings

10  by Fremont officers, raise a genuine issue as to the Department's deliberate indifference to critical

11  training needs.  The trier of fact must have an opportunity to determine that the City's training

12  failures were a moving force behind the violation.  *Canton*, 489 U.S. at 389, 390.

13         As defendants acknowledge (Motion, at 15), the City may be held liable for its deliberate

14  indifference to David's rights to life, liberty, and familial association regardless of whether the

15  individual officers are found liable for excessive force.  *See, e.g., Fairley v. Luman*, 281 F.3d 913

16  (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that

17  individual officers are exonerated is immaterial to liability under § 1983."); *Chew v. Gates*, 27 F.3d

18  1432, 1445 (9th Cir. 1994) (noting that a jury could conceivably find that an officer's actions were

19  reasonable under the circumstances but the city was nevertheless at fault for its policies or

20  practices).

21         **E.      Genuine Issues Exist as to Chief Steckler's Liability**

22         Genuine issues of fact exist as to whether the Department, headed by Fremont Police Chief

23  Steckler, maintained an unofficial custom or policy of deliberate indifference to constitutional

24  violations by its officers.  Therefore, there is no basis to grant summary judgment in favor of Chief

25  Steckler.  Proper individual defendants in a § 1983 action include "those officials who were in

26  office before or at the time [plaintiff was killed] and who may have adopted a plan or policy

27  authorizing the alleged unconstitutional violation."  *Heller v. Bushey*, 759 F.2d 1371, 1375 (9th

28

PLTFF. JENNIFER DAVID'S OPPOSITION TO DEFT'S MOTION FOR SUMMARY JUDGMENT

Cir. 1985), *rev'd and remanded on other grounds sub nom. City of Los Angeles v. Heller*, 475 U.S. 796 (1986).  Chief Steckler was responsible, among other things, for the adequacy of the Department's training policy.  (Dauzat Dep. 32:17-20).  It was "apparent" that the training provided to Fremont Officers was inadequate and that Officer Chinn's unconstitutional conduct did not warrant ratification.  Therefore, Chief Steckler is not entitled to qualified immunity.

**V.  CONCLUSION**

For all the foregoing reasons, and for the reasons set out in plaintiff M.D. and Rachel David's Opposition to Defendant's Motion for Summary Judgment, in which plaintiff joins, genuine issues of material fact exist as to the liability of all defendants.  Plaintiff Jennifer Samson David respectfully requests that defendants' Motions be denied.

Dated: May 18, 2006                         LAW OFFICES OF MICHAEL S. SORGEN

                                                                         /s/
                                                      By: _____
                                                             Joshua Sondheimer
                                                             Attorneys for Plaintiff