**United States District Court**
For the Northern District of California

1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7

8    JENNIFER SAMSON DAVID,
                                          No. C 05-46 CW
9              Plaintiff,                  Consolidated with
                                          No. C 05-956 CW
10        v.
                                          ORDER GRANTING
11   CITY OF FREMONT, et al.,             DEFENDANTS'
                                          MOTION FOR
12             Defendants.                SUMMARY JUDGMENT
     _____/
13

14   RACHEL DAVID and minor M. D., by and
     through her Guardian Ad Litem, LORI
15   ALEMANIA,

16             Plaintiffs,

17        v.

18   CITY OF FREMONT, et al.,

19             Defendants.

20   _____/

21

22

23        Defendants City of Fremont, Officer Michael Chinn and Police

24   Chief Craig Steckler move pursuant to Federal Rule of Civil

25   Procedure 56 for summary judgment, or in the alternative for

26   partial summary adjudication of the claims against them.

27   Plaintiffs Jennifer David, Rachel David and M.D. oppose the

28

motion.[1]  The matter was taken under submission on the papers.
Having considered all of the papers filed by the parties, the Court
grants Defendants' motion for summary judgment.

BACKGROUND

I.  Events of February 18, 2004

This lawsuit arises out of the death of Glenn David, husband
of Plaintiff Jennifer David and father of Plaintiffs Rachel David
and minor M.D.  The facts set forth below are undisputed, unless
otherwise noted, although in some cases the parties dispute the
inferences that may be reasonably drawn from the facts.

Mr. David lived with his sister, Constant Novak, and her
husband, Robert Novak.  On February 18, 2004, Mr. David was at his
workplace, GarrettCom, an electronics firm in Fremont, California.
Mr. Novak also worked at GarrettCom and recalls that that day at
work, Mr. David seemed unproductive and like a "lost soul."

That evening, Mr. David and numerous other GarrettCom
employees were working late.  At around 8:00 p.m., Mr. David called
his brother-in-law, but Mr. Novak was unable to understand him and
suspected that he was still under the influence of illegal drugs
taken two days earlier.  After talking to Mr. Novak on the phone,
Mr. David obtained a knife.  One co-worker saw Mr. David stab
himself twice in the stomach.  Many employees left the building.

_____

[1]Jennifer David and Rachel David and M.D. brought separate
lawsuits which have since been consolidated.  The two sets of
Plaintiffs filed separate oppositions; however, each set joins in
the other's opposition, and therefore collective references to
Plaintiffs refer to both sets.

United States District Court

For the Northern District of California

Co-worker Lance Deutscher heard a scream and returned to try to engage Mr. David. He recalls looking through a doorway and seeing Mr. David with a big, long knife in his fist and bleeding gashes in his arm. Mr. Deutscher yelled, "Glenn," and asked what he was doing, but Mr. David only mumbled incoherently. Mr. David looked "wobbly like he was ready to pass out." Deutscher Dep. 48:8-9. Because of the knife, Mr. Deutscher didn't approach any closer, and he concluded after a few minutes that it would be smarter to leave. Mr. Deutscher left to go to the parking lot; by that time police had arrived.

A GarrettCom employee had called 911, and Fremont Police Department (FPD) dispatchers alerted police officers to a "Male inside the business who is suicidal and has knife; all other employees are outside." Pl.'s Ex. 2, Fremont Police Radio Channel Transcript 0208. The patrol supervisor issued instructions to officers, including, "Let's just contain him for now until we get ourselves set up" and, "Apparently he's inside the building. So let's set up a perimeter and wait for 'less-than-lethal,' then we'll go in." Pl.'s Ex. 1, Track 2, 8:45 and 9:20. The dispatcher also advised that Mr. David had not threatened anyone and that an officer with a "pepperball gun" and a trained hostage negotiator were on their way.

Officer William Malcomson was the first officer on the scene. He responded to an instruction that he had heard to "stage," meaning that he should "wait for other officers to arrive on scene

United States District Court

For the Northern District of California

before going in and trying to assess the situation."[2]  Malcomson
Dep. 72.  Although he had heard that all employees were out of the
building, he viewed that as "secondhand information," and
considered it part of his job to determine for himself whether
anyone was in the building.  Id. at 115.  He was told by employees
in the parking lot that Mr. David was inside the building and that
all other GarrettCom employees were outside; Officer Malcomson
relayed this information to the police dispatcher.

Defendant Officer Chinn was the second officer on the scene,
shortly behind Officer Malcomson.  Officer Chinn had heard on the
radio that Mr. David had stabbed himself in the stomach.  Officer
Chinn does not recall hearing an instruction to stage.  Chinn Dep.
79.  Two additional officers, Officer Nevin and Officer Spear,
arrived right behind Officer Chinn.

After speaking with GarrettCom employees, Officer Malcomson
drove in his car toward the rear of the office building where Mr.
David was believed to be.  Officer Chinn followed in his vehicle.
Officer Malcomson stopped his car, and intended to consult with
additional employees congregating outside and with Officer Chinn.
His did this "[f]or officer safety reasons, as well as [because] a
supervisor on the radio had advised a stage."  Malcomson Dep. 68.

_____

[2]There discrepancies in the record regarding the meaning of
the term "stage."  FPD Captain Robert Nelson testified that both
Officer Malcomson and Officer Chinn "staged," and that "the intent
of staging basically is for the Sergeant, being Kevin Gott at this
point, to get there, to be able to have incident command."  Nelson
Dep. 100.  However, FPD Captain Richard Lucero in his deposition
stated that the order to "stage" meant "the first unit doesn't
proceed to contact until there is somebody out there, so that two
officers go instead of one"; Captain Lucero did not mention waiting
for the Sergeant.  Lucero Dep. 174.

At that point, Officer Malcomson knew that Mr. David was suicidal and that an officer with less-lethal force and a trained negotiator were en route.  Officer Chinn, however, continued on to the rear of the building without stopping to consult.  Officer Malcomson, concerned that he needed to provide "cover" for Officer Chinn, got back in his car and followed.

Officer Chinn saw three people whom he believed to be GarrettCom employees leaving the building as he approached the rear.  He asked them if the suspect was in the building, but did not ask them whether any other employees remained inside.  At that time, Officer Chinn had no information about whether there were any other people inside.  He believed that Mr. David posed a risk of injury to others because he had stabbed himself.

Officer Chinn approached within ten or fifteen feet of an open door at the back of the warehouse.  He looked through the doorway and shined a flashlight inside.  He saw Mr. David walking forward with a knife, and drew his gun in response.  At first, Mr. David was about eighty feet away and walking towards Officer Chinn.  Mr. David was walking "a little faster than a normal pace," and at times stopped and retreated.  Chinn Dep. 120.  Officer Chinn continuously told Mr. David to drop the knife, and asked Mr. David his name in an attempt to establish rapport.  Mr. David yelled, "Shoot me; shoot me now," and a number of other unintelligible things.  Id. at 121; Fox Decl., Ex. K, Officer Malcomson's Tape Recording (hereinafter Tape Recording).  Officer Chinn could see that the subject had blood on his shirt, abdomen and wrists.  Mr. David made "stabbing motions" with the knife toward Officer Chinn.

United States District Court

For the Northern District of California

Chinn Dep. 137.  By then, Officer Chinn was in an exposed position in the middle of the doorway, a position he considered necessary in order to hold his gun with his strong (left) hand.  Officer Chinn says that he did not simply close the steel warehouse door because he wanted to isolate Mr. David, yet he did not know whether other people were still in the building, and he feared he might lose control if the door was closed and Mr. David was allowed to wander inside.  Id. at 128-29.  According to Officer Chinn, there was no need to "stage" by this time because that order applied only to Officer Malcomson, the first officer on the scene.  Id. at 80.

Officer Malcomson was behind Officer Chinn, and testified that Mr. David seemed "very agitated" and was "kind of yelling out threats and things."  Malcomson Dep. 88.  Officer Malcomson recalls Mr. David saying something like, "I'm going to throw the knife"; the officer feared that he would do so.  Id. at 96.  Officer Malcomson kept his gun in a "low ready" position because Officer Chinn was standing in front of him.  Officer Malcomson twice requested the police dispatcher to expedite arrival of less-lethal force, because "the subject was escalating the situation."  Id. at 96; see also Tape Recording (stating that Mr. David "is trying to get us to use our 1027s").

Mr. David kept advancing toward Officer Chinn, and at one point pushed a hand truck out of the way.  When the men were between twelve and fifteen feet apart, Officer Chinn fired a first shot, which he now believes hit Mr. David in the solar plexus.  When Mr. David did not seem to respond, Officer Chinn quickly fired a second shot, which missed.  When asked at his deposition, "If

[the decedent] was suicidal, and wanted your help in consummating the suicide, then, he was going to get it, right?", Officer Chinn testified, "Yes."   Chinn Dep. 199.   A little over a minute elapsed between Officer Chinn's initial sighting of Mr. David and the shooting.

Mr. David was taken by ambulance to San Jose Medical Center, where he was given emergency surgery but died in the operating room.   The cause of death was identified as a "gunshot wound of the abdomen."   Sondheimer Decl., Ex. 4, Rep. of Autopsy.   A toxicologist's analysis revealed that methamphetamine was present in Mr. David's system at the time of his death.   Fox Decl., Ex. J, Middleberg Rep.

## II.  Training

The FPD's Protocol for Managing Critical Incidents provides that the "first officer on scene is in control of the scene until relieved by a supervisor."   Sondheimer Decl., Ex. 3, Feb., 2001 FPD Protocol for Managing Critical Incidents 2.   The first officer on scene "should be concerned for his or her safety and the safety of all persons present," and "will develop a response plan for additional responding officers."   Id.   The first officer

> has the authority and the responsibility to control and dictate the response of additional responding units.   This includes setting of perimeters, initial assignment upon arrival, establishing staging locations, and other tactical/strategic needs.

Id. at 3.   Officer Chinn testified, "Usually, it's the first-responding officer's responsibility to, you know, gather information, to make decisions at the scene."   Chinn Dep. 76-77. However, he also stated that there was "no specific thing that

United States District Court

For the Northern District of California

1  says, you know, one particular officer is 'in charge' or not,

2  unless, you know, an officer assumes that position."   Id. at 77.

3       On May 18, 1999 (prior to Officer Chinn's joining the FPD),

4  FPD officers received a training by Dr. Barry Perrou on suicide

5  intervention, including the phenomenon of "suicide by cop."  A

6  summary of Dr. Perrou's instructions to field personnel states, in

7  part,

8           Simply stated, stop, look and listen.
            Don't rush the situation.
9           Don't precipitate the conflict . . . don't become a target.
            Maintain cover.
10          No heroic actions.
            Maintain discipline for a controlled contact with the subject.
11          Coordinate with the desk any update information from inside
            the location and seek compliance with all parties for a safe
12          evacuation and/or surrender.

13  Sondheimer Decl., Ex. 6, FPD Suicide-in-Progress Course Materials

14  1257 (capitalization omitted).  Dr. Perrou's recommendations

15  included,

16          Techniques
                [. . .]
17              Stay together.
                Call suspect out of house or have desk call back to
18              location and have suspect step out.
                Off-set officers when approaching.
19              Avoid entering home.

20          Do's
                Slow down situation.
21              Control environment.
                Contain and evacuate.
22              Establish incident commander.
                Develop a 2-component plan:  verbal (mental)
23              intervention; tactical intervention (if possible) (this
                is different from tactical containment).
24              [. . .]
                Request assistance from trained suicide interveners
25              (County counsel . . . Davidson vs. Westminster).
                Collect all available information about patient before
26              approach . . no need to rush.
                Fully discuss and review all aspects of the plan:  abort,
27              retreat, cover, field of fire.

28                                        8

United States District Court
For the Northern District of California

If/when approach is appropriate, always in pairs.
Back-up intervener has primary responsibility to protect
primary intervener (they are usually too mentally
preoccupied and focused).
[. . .]

Don't's [sic]
    Don't rush.
    Don't allow heroic acts.
    Don't allow independent actions.
    Don't create a target.
    Don't precipitate the death or attempted death.
    Don't demand control from the patient . . trust and
    surrender takes time.

Id. at 1269-74 (capitalization omitted).  A second 1999 training

was entitled "Police Handling of the Mentally Ill" and conducted by

Defendants' counsel Gregory Fox.  Dr. Perrou and Mr. Fox's

recommendations were later issued as a FPD "Training Bulletin" and

were incorporated into the FPD's Protocol for Handling Critical

Incidents.  Nelson Dep. 145-46.

Officer Chinn attended a November, 2003 "Critical Incident

Response" training that incorporated some scenarios involving

"suicide by cop" and disturbed individuals, but this training did

not get into "in-depth negotiation" to the same extent as the 1999

trainings did.  Nelson Dep. 145-46.  Captain Nelson explained that

this recent training was conducted by a psychologist and "basically

covered some of the same things that Mr. Fox and Mr. Perrou

presented back in '99."  Nelson Dep. 149.

III.  Municipal Response

The FPD's policy is to use Training Review Boards to review

incidents for training purposes.  If a Review Board discovers

"suspected violations of law, rules, policies, or procedures," the

FPD Review Board is to "immediately cease its inquiry and refer the

United States District Court

For the Northern District of California

matter to Internal Affairs." Sondheimer Decl., Ex. 9, FPD

Procedural Directive:  Training Review Boards, Sec. II.

Captain Lucero recommended the initiation of a Training Review

Board to review the events of February 18, 2004, "if based on

nothing other than the compelling nature of the hazards faced and

the gravity of the outcome." Sondheimer Decl., Ex. 10, Mar. 19,

2004 Memo to Captain Nelson from Captain Lucero.  In making this

recommendation for review, Captain Lucero characterized Officer

Chinn's decision to discharge his firearm as "necessary and

appropriate." Id.  After reviewing the incident, the Review Board

concluded that "the clear, overt actions of the decedent, Glenn

David, left the officers with no recourse but to use deadly force,"

and that "all of the officers associated with this incident acted

in a professional manner and within departmental policy."

Sondheimer Decl., Ex. 11, July 27, 2004 Memo to Chief Steckler from

Captain Nelson, Executive Summary (hereinafter Review Board

Executive Summary).  Captain Nelson later testified that he

considered Officer Chinn's conduct to be "admirable" because,

confronted with a "very unique situation,"

> [h]e handled himself very professionally; he tried to talk to
> Mr. David; he tried to tell him to stop; he even mentioned, I
> believe at one point, that he want -- he wanted to help him,
> and Mr. David was non-compliant, he was aggressive.
>     And considering the circumstances, we -- and the fact
> that Michael Chinn let Mr. David get extremely close to him
> before he made the decision to use deadly force, I think, was
> admirable.

Nelson Dep. 114-15.

However, certain of the Board's findings are critical of

Officer Chinn's performance.  The memo notes that "Chinn approached

10

the open rear door by himself and was unaware of the locations of his fellow officers"; that Officer Chinn's approach of the open door on the left side despite the fact that he is left-handed "caused Chinn to unnecessarily expose himself to engage David"; that "Malcomson was unable to provide lethal cover because of Chinn's positioning"; that "[i]ndividual communication between officers could be improved"; and that the response team that approached the open doorway would have "optimally" been comprised of a sergeant plus three to five officers.  Review Board Executive Summary at 3-4.  In addition, the Review Board found that, although Officer Chinn believed that the situation warranted an "active shooter response," "[b]ased upon the information received and broadcasted to the Officers on scene, the incident had not risen to the level of an active shooter tactical response."  Nisenbaum Decl., Ex. A, July 15, 2004 Memo from Lieutenant Frank Grgurina to Captain Robert Nelson.

The Review Board did not make any recommendations that applied particularly to Officer Chinn.  It did generally recommend refresher training in the areas of critical incident response planning, tactical operations and less lethal deployment.  The Review Board advised that the FPD's Critical Incident Response Training "will continue to prepare our officers to confront these types of incidents," and recommended examination of other types of less-lethal options, including tasers.  Review Board Executive Summary at 5.

IV.   Other Incidents and Municipal Response

In addition to the shooting death of Mr. David, FPD officers have discharged their weapons in eleven other incidents between 1992 and 2005.  Sondheimer Decl., Ex. 7, Summary of FPD Officers Discharging Their Weapons.  Of these eleven incidents, at least four involved emotionally disturbed individuals.  Id. (describing incidents on Aug. 20, 1993; Jan. 3, 1998; Feb. 19, 1998 and Apr. 18, 1999).  Captain Lucero testified that the "great majority" of incidents involving suicidal individuals do not result in officer shootings.  Lucero Dep. 179.

No officer-shooting incidents occurred in the three and one half years following the 1999 trainings by Dr. Perrou and Mr. Fox; Captain Lucero attributes this gap merely to "good fortune," not the Perrou and Fox trainings.  Lucero Dep. 63.

Of the eleven incidents, five resulted in the officers' killing of the suspects; two resulted in the suspects' suicides; and four resulted in the officers' wounding of the suspects. According to Captain Lucero, none of the incidents involving officers killing or wounding subjects has resulted in any discipline for discharging their weapons, and he is not aware of any changes in FPD policy resulting from these incidents.  Lucero Dep. 150-51, 155.  Since the Training Review Board was created in 2002 to address such incidents, none of the four Review Board procedures have resulted in referral of the incident to the FPD's Internal Affairs department for investigation.  Nelson Dep. 53-54.

The August, 1993 incident was the subject of a reported decision, Adams v. City of Fremont, 68 Cal. App. 4th 243 (1998), in

**United States District Court**

For the Northern District of California

which the appellate court reversed a judgment in the plaintiffs' favor, on the grounds that the officers owed no duty of care to take reasonable steps to prevent the suicide.  The jury had found that FPD officers' tactics negligently caused the suicide of a distressed individual.  Among the factual bases for this finding were lack of control, insufficient communications, lack of information, failure to respond to a suicide call as such, failure to follow FPD procedures for dealing with a critical incident, allowing an untrained officer to attempt to negotiate with the suicidal subject and failure to back down to allow calming of the situation.  68 Cal. App. 4th at 260.  The City of Fremont contested the jury's findings.  Id. at 261.

As Plaintiffs note, five incidents of police fire, including the shooting of Mr. David, occurred in the two years between September, 2003 and September, 2005.  Of the five incidents during that two year span, two resulted in death (Mr. David and a suspect who took two juveniles hostage) and three resulted in the wounding of the suspects.  However, Captain Lucero testified that, although each incident was discussed within the FPD, the department did not consider these five incidents to be problems caused by the FPD. Lucero Dep. 66.  According to Captain Nelson, these subsequent incidents "don't necessarily even represent situations where we had time to use the strategies" presented in trainings on suicidal and emotionally disturbed subjects.  Nelson Dep. 153.

V.  Selected Expert Evidence

Mr. Roger A. Clark, Plaintiffs' police practices expert, characterizes Officer Chinn's approach as excessively forceful and

13

**United States District Court**

For the Northern District of California

incompetent, and finds that he failed to follow proper field tactics and procedures for dealing with suicidal or emotionally disturbed individuals. Sondheimer Decl., Ex. 5, Clark Rep. at 1. He opines that "all Officer Chinn had to do to avoid a confrontation was to withdraw, shut the door and maintain the containment as ordered." Clark Rep. 15.

More generally, Mr. Clark opines that the FPD in the years prior to the incident "demonstrated a departure from established safe police practices," and that this departure "resulted in an increase in the number of police shootings within the city." Id. at 2. He opines that a "competent analysis" by FPD officials "would have identified (and corrected) the systemic and problematic cultural values, attitudes and beliefs at the heart of the problem." Id. However, Mr. Clark does not opine that the FPD's officer training was inadequate; indeed, he suggests that Officer Chinn should have known, based on his training, that his use of force was excessive. Nor does Mr. Clark provide any analysis of incidents other than the one involving Officer Chinn and Mr. David.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no

14

United States District Court

For the Northern District of California

material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods.  <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party

15

United States District Court

For the Northern District of California

support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105 (citing Adickes, 298 U.S. at 158). If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id.; see also

16

United States District Court

For the Northern District of California

1  Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th

2  Cir. 1991).   Once it has done so, the non-moving party must set

3  forth specific facts controverting the moving party's prima facie

4  case.   UA Local 343, 48 F.3d at 1471.   The non-moving party's

5  "burden of contradicting [the moving party's] evidence is not

6  negligible."   Id.   This standard does not change merely because

7  resolution of the relevant issue is "highly fact specific."   Id.

8                              DISCUSSION

9  I.   Fourth Amendment Claims

10      Defendants move for summary adjudication that Officer Chinn's

11 initial tactics and his subsequent use of deadly force were

12 objectively reasonable and therefore did not violate Mr. David's

13 Fourth Amendment rights.   Plaintiffs argue that Officer Chinn's use

14 of force was objectively unreasonable and that his acts prior to

15 the shooting unreasonably provoked the confrontation with Mr.

16 David.

17      A.   Applicable Law

18      Claims of excessive force which arise in the context of an

19 arrest, investigatory stop or other "seizure" of a person are

20 analyzed under the Fourth Amendment reasonableness standard.

21 Graham v. Connor, 490 U.S. 386, 395 (1989).   While unreasonable

22 force claims are generally questions of fact for the jury, Hervey

23 v. Estes, 65 F.3d 784, 791 (9th Cir. 1995), such claims may be

24 decided as a matter of law if the district court concludes, after

25 resolving all factual disputes in favor of the plaintiff, that the

26 officer's use of force was objectively reasonable under the

27 circumstances.   Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).

28                                 17

United States District Court

For the Northern District of California

However, summary judgment "should be granted sparingly" because the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).

The question in such a determination is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.  Determining whether use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting in part United States v. Place, 462 U.S. 696, 703 (1983)).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.  The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97.

Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.  The most important element is "whether the suspect poses an immediate threat to the safety of the officers or others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005) (quoting Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994)).  A fact-finder may also consider "the

18

United States District Court

For the Northern District of California

availability of alternative methods of capturing or subduing a suspect." Smith, 394 F.3d at 703 (citing Chew, 27 F.3d at 1441 n.5). Another factor to be considered in applying the Graham balancing test is "the giving of a warning or the failure to do so." Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir. 2001). "[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed." Deorle, 272 F.3d at 1283.

B.   Officer Chinn's Conduct Leading to Deadly Force

Plaintiffs' primary argument is that Officer Chinn violated Mr. David's Fourth Amendment rights by intentionally or recklessly engaging in objectively unreasonable conduct that resulted in Mr. David's otherwise avoidable death.

Several Ninth Circuit cases set forth the approach to be used when police are alleged to have committed a Fourth Amendment violation involving unreasonable provocation of the defensive use of force. In Alexander v. City and County of San Francisco, 29 F.3d 1355 (9th Cir. 1994), the court found that police defendants could be held liable if they used excessive force by storming the home of a mentally ill individual, ultimately killing him in self-defense. This was so even though the plaintiff did not dispute that once the decedent pointed a gun at the officers and pulled the trigger, their use of deadly force in response was reasonable. In Billington v. Smith, 292 F.3d 1177 (9th Cir. 2002), the Ninth Circuit reviewed a district court's decision that although a defendant police officer's deadly force was reasonable at the time

19

United States District Court

For the Northern District of California

of the shooting, disputed issues of material fact existed as to whether the defendant's alleged tactical errors "before the moment of shooting made his reasonable use of force at that moment unreasonable." 292 F.3d at 1185. The Ninth Circuit reversed the denial of summary judgment. Restating its holding in Alexander, the court clarified that "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." Id. at 1189. In that circumstance, however, the "basis of liability for the subsequent [defensive] use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonableness standard." Id. at 1190.

Plaintiff Jennifer David's suggestion that to prove a Fourth Amendment violation she need only establish that Officer Chinn's acts were unreasonable and a proximate cause of her husband's death misstates the holding in Billington. Although events leading up to a shooting may be considered in judging the reasonableness of the shooting itself, a plaintiff cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." Id.

> An officer may fail to exercise 'reasonable care' as a matter of tort law yet still be a constitutionally 'reasonable' officer. Thus, even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation.

Id. (emphasis in original). In Billington, the Ninth Circuit found that although the plaintiffs had identified a series of arguable

20

United States District Court

For the Northern District of California

tactical errors, none was an independent violation of the Fourth Amendment and thus none precluded summary judgment in the defendant's favor.  Therefore, to prevail under this theory of Fourth Amendment liability, Plaintiffs must raise a disputed issue of material fact not merely about whether Officer Chinn's acts prior to the shooting were unreasonable, but whether one or more of those acts, construed in the light most favorable to Plaintiffs, constituted an independent Fourth Amendment violation.

In determining whether Officer Chinn's pre-shooting acts constituted excessive force, a trier of fact could properly weigh at least some of his arguable violations of police protocol and procedure, even if those alleged violations are not independently actionable.  See Billington, 292 F.3d at 1190 (noting that events preceding allegedly unconstitutional use of excessive force may be relevant to determining whether use of force was unreasonable).  Defendants object to some of these alleged violations on grounds of materiality.  The Ninth Circuit has held that internal police guidelines are only relevant to determining whether use of force is objectively reasonable "when one of their purposes is to protect the individual against whom force is used." Scott, 39 F.3d at 915-16.  In Scott, the appellate court found that alleged violations of police protocol for dealing with barricaded subjects (including procedures for developing a tactical plan, sealing possible escape routes and calling for assistance) were irrelevant to the plaintiff's excessive force claim because the purpose of those procedures was to safeguard the police and innocent parties, not the subject.

21

Here, some of the alleged protocol violations identified by Plaintiffs are not germane to the excessive force inquiry because there is no reason to conclude that guidelines at issue are meant to protect subjects.[3]  Plaintiffs allege that Officer Chinn violated the Protocol for Managing Critical Incidents' requirement that the "first officer on scene is in control of the scene" by failing to consult with Officer Malcomson before approaching the rear door of the building.  Plaintiffs also point to the FPD Review Board's finding in that Officer Chinn unnecessarily exposed himself by approaching an open door without cover and from the left side even though he was left-handed.  These protocols fall into the same category as those that in <u>Scott</u> were determined to be irrelevant to the issue of excessive force.

Another purported disputed issue of material fact is whether Officer Chinn received and disobeyed an order to "stage."  The evidence reveals ambiguity in the meaning of the term "stage": it could mean only that the first officer should wait to act until a second officer arrives, or that all officers should wait until less-lethal force and the hostage negotiator arrived.  If the former, the order to "stage" would appear to be only to ensure officer safety, and thus under <u>Scott</u> would be irrelevant to the excessive force issue.  Furthermore, there is no direct evidence

---

[3]A corollary of this point is that even if Officer Chinn had successfully followed certain procedures and protocols, there is no basis from which a trier of fact could conclude that this would have ensured Mr. David's safety.  For instance, Officer Malcomson has testified that had he been in the position to do so, he would have used deadly force against Mr. David sooner than Officer Chinn did.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

that Officer Chinn received an order to "stage"; that particular order is not included in the FPD transcript of the incident, and only Officer Malcomson recalls receiving an order to stage. Therefore, the Court finds that there is no evidence that Officer Chinn violated an order to "stage."

Nevertheless, Defendants overreach in arguing that the FPD's critical incident and suicide intervention guidelines are all irrelevant because their primary purpose is to protect the police and innocent parties. Of course, police and bystander safety is a primary objective of the guidelines. However, the guidelines also appear to be, at least in part, designed to minimize the risk of harm to the distressed or suicidal individual. For instance, the order that officers wait for less-lethal force before entering a building clearly contemplates the goal of ensuring the distressed or suicidal individual's safety. Similarly, guidelines such as "don't rush," "request assistance from trained suicide interveners," "don't precipitate the attempted death," and "don't demand control from the patient" all appear to serve dual purposes. Here, the evidence that Officer Chinn acted contrary to the dispatcher's instructions to wait for the arrival of non-lethal force could lead a trier of fact to infer that Officer Chinn was behaving recklessly and contrary to police protocol for dealing with distressed or suicidal individuals.

Plaintiffs do not identify any particular pre-shooting act or error as an independent constitutional violation. Plaintiffs do point to the following acts as evidence that Officer Chinn unreasonably provoked the confrontation with Mr. David: Officer

United States District Court

For the Northern District of California

Chinn pointed his gun at Mr. David and demanded that he drop the knife, thereby agitating and provoking Mr. David; Officer Chinn failed to obey the police dispatcher's order to "set up" the scene and wait for non-lethal force and a negotiator; he failed to consult with and defer to Officer Malcomson, the first officer on the scene; he failed to gather information from employees about who was left in the building; and he failed to follow police guidelines for responding to an attempt at "suicide by cop." For the most part, these acts are alleged tactical mistakes that do not, in themselves, involve an intrusion into Mr. David's Fourth Amendment interests which could form the basis for independent constitutional liability. Cf. Alexander, 29 F.3d at 1362 (finding disputed issue of fact as to whether police officers violated decedent's Fourth Amendment rights by entering his house without an arrest warrant).

Officer Chinn's only arguable intrusion on Mr. David's Fourth Amendment interests prior to the shooting occurred when, after seeing Mr. David walking forward with a knife, he drew his gun in response and ordered Mr. David to drop the knife. A drawn gun may effect a seizure if it creates a "restraint of liberty such that the person reasonably believes that he is not free to leave." Robinson v. Solano, 278 F.3d 1007, 1013 (9th Cir. 2002) (quoting Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994)). There is no seizure if police draw their guns only to ensure that the subject cannot attack them. Id.; Fuller, 36 F.3d at 68. The Ninth Circuit has held that the use of a drawn gun at close range, pointed at the head of an apparently unarmed misdemeanor subject, constituted excessive force. Robinson, 278 F.3d at 115. There, the court

24

found that none of the following relevant factors justified use of a drawn gun: "whether a warrant was used, whether the plaintiff resisted or was armed, whether one or more arrestee or officer was involved, whether the plaintiff was sober, whether other dangerous or exigent circumstances existed at the time of the arrest, and the nature of the arrest charges." Id. at 114 (quoting Chew v. Gates, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994)). As the Ninth Circuit has since noted, Robinson and other cases in which drawn guns have been held to constitute excessive force "involved facts upon which a court found that there were no apparent dangerous or exigent circumstances at the time the weapons were used." Johnson v. City of Bellevue, 2006 WL 223797, *5 (9th Cir. Jan. 30 2006) (holding officers' use of drawn guns against an obviously unarmed individual not excessive as a matter of law where officers reasonably believed subject was in imminent danger of hurting himself and he did not respond to officers' requests).

Here, Plaintiffs have shown no evidence sufficient to raise a disputed issue of fact as to whether Mr. David could have reasonably believed that he was under arrest or not free to leave, so long as he did not attack the officers. Furthermore, even assuming that Officer Chinn did seize Mr. David's person when he drew the gun, Plaintiff have not shown that this use of force was excessive. The fact that Mr. David had a knife and was walking towards the officers, and then failed to respond to orders to drop the knife, distinguishes this situation from cases such as Robinson where the use of a drawn gun has been found to violate the Fourth Amendment. So do the exigent circumstances described in more

25

detail in Section I(C) below:  Officer Chinn could reasonably have believed that Mr. David posed a risk to others.  Construing the facts in the light most favorable to Plaintiffs, Officer Chinn's conduct prior to the shooting does not constitute an independent constitutional violation.

C.  Use of Deadly Force

Plaintiffs also argue that Officer Chinn's shooting of Mr. David was itself an objectively unreasonable use of force.

Use of deadly force is an "unmatched" level of intrusion on an individual's Fourth Amendment interests.  Tennessee v. Garner, 471 U.S. 1, 9 (1985).  A police officer may reasonably use deadly force where he or she "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  Id. at 11.

The Court finds that Blanford v. Sacramento County, 406 F.3d 1110 (9th Cir. 2005), a case which neither set of Plaintiffs attempts to distinguish, is instructive here.  In Blanford, police responded to a 911 report of a subject, the plaintiff, who was walking through a suburban neighborhood, carrying a sword and behaving erratically.  Defendant police officers approached the plaintiff and repeatedly asked him to drop the sword; the plaintiff did not respond (it was later revealed that he was listening to loud music through earphones hidden under a knit cap, and could not hear the defendants' commands).  At one point, the plaintiff raised the sword and made a loud growling sound.  The defendants considered it a possibility that the plaintiff was mentally disturbed or under the influence of a controlled substance, but

United States District Court
For the Northern District of California

believed that he posed a threat of harm to others.  The plaintiff
approached a home (his parents' house) and attempted to enter.  The
defendants ultimately shot him three times, rendering him a
paraplegic.  The entire encounter lasted about two minutes.  406
F.3d at 1112-14.

Affirming the district court's grant of summary judgment, the
Ninth Circuit found that at the time of the shooting, the
defendants had "cause to believe that Blanford posed a serious
danger to themselves or anyone in the house or yard that he was
intent upon accessing, because he failed to heed warnings or
commands and was armed with an edged weapon that he refused to put
down."  406 F.3d at 1116.  The court found that the "fact that help
was on the way was immaterial in the circumstances of imminent
access."  406 F.3d at 1117.  Finally, it found that, although the
likelihood that Mr. Blanford was emotionally disturbed was a factor
to be weighed in determining a reasonable level of force, "Blanford
was armed with a dangerous weapon and it was not objectively
unreasonable for them to consider that securing the sword was a
priority."  406 F.3d at 1117; cf. Deorle, 272 F.3d at 1283 (noting
that the governmental interest in using such force is diminished
when officers are confronted with a mentally ill individual who has
not committed a serious crime).

The governmental interests at stake in this case are similar
to, but greater than, those at stake in Blanford.  As in Blanford,
no crime had been committed, Mr. David had not threatened others,
was not a criminal suspect and was not being sought for arrest.  As
in Blanford, Mr. David possessed a knife, and appeared to be

27

United States District Court
For the Northern District of California

emotionally disturbed. Unlike in <u>Blanford</u>, Mr. David was advancing
toward the officers, and therefore he posed a greater threat to the
officers' safety than did the retreating Mr. Blanford. The
governmental interest is also greater here than in <u>Herrera v. Las
Vegas Metro. Police Dep't</u>, 298 F. Supp. 2d 1043, 1050 (D. Nev.
2004), where, according to the version of the facts most favorable
to the plaintiffs,

> the Decedent was not moving toward the officers when he was
> initially shot with the bean bag rounds; was doubled-over with
> pain at the time the pepper spray was used; and was merely
> standing with the knife pointed skyward, stunned, for nearly a
> full minute before he was shot and killed.

Just as the <u>Blanford</u> defendants were concerned that unknown
persons in the house or yard could be at risk, part of Officer
Chinn's rationale for not withdrawing and shutting the door on Mr.
David was that he believed that would leave Mr. David free to roam
the building, and would pose a risk to any GarrettCom employees
left in the building. Plaintiffs' apparent position is that
Officer Chinn's belief that other employees might still be inside
and might be at risk was unreasonable. With the benefit of
hindsight, the evidence supports Plaintiffs' argument. The police
dispatcher had reported that all employees were out of the
building; and, in fact, Mr. Deutscher, the last employee, had left
just as Officer Chinn approached. Mr. David did not threaten Mr.
Deutscher or harm any person, and, in retrospect, he may have
advanced toward the police with the intent to harm only himself.

The Court, however, may view the facts only from the
perspective of an officer on the scene at the time. Viewed in this
manner, Officer Chinn reasonably believed that Mr. David would not

be sufficiently contained if the door was shut.[4]  It is true that Officer Chinn had been told that everyone was out of the building, and that he might have confirmed this fact eventually by talking to people in the parking lot about who might be left inside.  However, Officer Chinn also saw three people leaving the building as he was approaching the rear, and Mr. Deutscher was leaving Mr. David as Officer Chinn approached.  Officer Chinn could reasonably have believed that the earlier information that everyone was out of the building was unreliable, and that obtaining first-hand confirmation was necessary to secure a perimeter.

Officer Chinn also could reasonably have believed that Mr. David posed a threat to himself, Officer Malcomson and others in the parking lot based on his incoherent, agitated demeanor and the stabbing motions made with the knife.  Only with hindsight is it apparent that Mr. David reacted in this aggressive manner only toward the police.

Therefore, construing the evidence in the light most favorable to Plaintiffs, the Court concludes that the government interests at stake were at least as important as those in <u>Blanford</u>, and that Officer Chinn's use of deadly force was reasonable as a matter of law.  Accordingly, the Court grants Defendants' motion for summary adjudication of Plaintiffs' § 1983 claims for excessive force.

II.   Fourteenth Amendment Claims

Defendants move for summary adjudication that Officer Chinn's actions are not sufficient to establish a violation of substantive

---

[4]Plaintiffs concede that Officer Chinn had been instructed to "contain" Mr. David.  Jennifer David's Opp. at 11.

**United States District Court**
For the Northern District of California

due process rights.  Plaintiffs oppose summary adjudication, arguing that Officer Chinn's intentional violation of dispatch orders and usurping of the negotiator's role violated Mr. David's rights under the Fourteenth Amendment.

A.  Applicable Law

The Due Process clause of the Fourteenth Amendment protects individuals against governmental deprivations of "life, liberty or property" without due process of law.  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 570-71 (1972); <u>Mullins v. Oregon</u>, 57 F.3d 789, 795 (9th Cir. 1995).  The Due Process clause is not implicated by a State official's negligent act causing unintended loss or injury to life, liberty, or property.  <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986) (citing <u>Daniels v. Williams</u>, 474 U.S. 327, 331-333 (1986)).  Instead, an analysis of the Fourteenth Amendment's guarantee of substantive due process requires that the State actor's conduct be deemed unconstitutional only if it "shocks the conscience."  <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998).

This "conscience-shocking concept" points away from liability where the harm is negligently inflicted, and towards liability only where the harm is deliberately inflicted.  <u>Id.</u>  Therefore, an important factor in determining whether behavior is egregious and shocks the conscience is whether circumstances allowed the State actors "time to fully consider the potential consequences of their conduct."  <u>Moreland v. Las Vegas Metro. Police</u>, 159 F.3d 365, 373 (9th Cir. 1998).

B.  Analysis

Plaintiffs' description of those acts which purportedly "shock

United States District Court

For the Northern District of California

the conscience" appears to mischaracterize the evidence they cite.
They refer to the Training Review Board Tactical Report as evidence
of "Officer Chinn's inexplicable disregard by Defendant Officer
Chinn of acting Sergeant Gott's order to stage," yet that memo does
not describe an order to "stage" directed at Officer Chinn (for the
reasons explained in Section I(B) above, it appears that the order
to stage could have been directed at Officer Malcomson), or any
other violation by Officer Chinn of a direct order.  Interpreted in
the light most favorable to Plaintiffs, the Tactical Report shows
that Officer Chinn was executing an order to secure the perimeter,
but that while doing so, he responded with an unwarranted "active
shooter" approach.

Officer Chinn's other allegedly "conscience-shocking" act was
intentionally usurping the trained negotiator's role.[5]  As evidence
that this act was intentional, Plaintiffs point to Officer Chinn's
testimony that he asked Mr. David, "What's your name?" in an
attempt to establish rapport.  Plaintiffs also note that nowhere on
the fifty second tape recording did Officer Chinn call out to
others who may have remained in the building, despite his stated
concern about the risk of harm to others.  In the absence of other
evidence that Officer Chinn deliberately intended to harm Mr.

---

[5]Plaintiffs also claim that, having purposely assumed the role
of negotiator, Officer Chinn then performed that role
incompetently.  See Pls. Rachel David and M.D.'s Opp. at 15-20.
However, Plaintiffs do not argue that Officer Chinn intentionally
sabotaged his negotiations with Mr. David, and therefore his
conduct during the negotiations cannot be an independent basis for
Fourteenth Amendment liability.

**United States District Court**

For the Northern District of California

David,[6] however, the alleged usurping of the negotiator's role here, even if contrary to police protocol, does not shock the conscience.  Moreover, any alleged usurping of the negotiator's role, even if it was negligent or reckless error, is more consistent with an intent to preserve Mr. David's life than an intent to end it.

Plaintiffs also mischaracterize the amount of time Officer Chinn had in which to make decisions, an important, undisputed fact which weighs against substantive due process liability.  The events of February 18 took place within a very short time frame: about three minutes between Officer Chinn's arrival at the scene and his shooting of Mr. David, and just about one minute between their initial encounter and the shooting.  Plaintiffs argue that this is an "extraordinary amount of time" during which Officer Chinn could have called out to determine whether others were in the building and considered other options for diffusing the situation.  The Court finds, however, that no reasonable trier of fact would conclude that a large amount of time was available to Officer Chinn.  Indeed, the tape recording of the incident makes clear that the participants were fully engaged in a tense standoff that

---

[6]Plaintiffs attempt to buttress their claims regarding Officer Chinn's level of culpability by speculating that he rushed into the situation in order to demonstrate his credentials for the FPD SWAT team.  However, Plaintiffs do not show any evidence that Officer Chinn's acts that day would have helped him win a place on the SWAT team, or that Officer Chinn had such a subjective belief.  Officer Chinn applied to be on the SWAT team on one of the two instances when a spot was available to him.  The Court finds that this is not a sufficient basis from which a reasonable juror could conclude that Officer Chinn deprived Mr. David of his constitutional rights for the purpose of advancing his career.

United States District Court

For the Northern District of California

progressed very quickly.  Plaintiffs fail to acknowledge other undisputed facts which suggest that Officer Chinn was not acting arbitrarily, e.g. that GarrettCom employees were continuing to leave the building as he approached, forming a basis for a reasonable concern that Mr. David posed a risk to others remaining inside.  Therefore, the Court finds that Plaintiffs have failed to raise a dispute of material fact as to whether Officer Chinn's taking of Mr. David's life violated the latter's right to substantive due process.

III.  Qualified Immunity

Defendants move for summary adjudication that Officer Chinn is protected by qualified immunity.

A.  Applicable Law

The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The threshold question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  The plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct. Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).  It is not necessary that a prior decision rule "the very action in question" unlawful for a right to be clearly established. Anderson v. Creighton, 483 U.S.

33

635, 640 (1987).  Some wrongs are self-evident and a "right can be clearly established on the basis of 'common sense.'"  <u>Lee v. Gregory</u>, 363 F.3d 931, 935 (9th Cir. 2004).  However,

> the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

<u>Anderson</u>, 483 U.S. at 640.  The general proposition that use of excessive force is contrary to the Fourth Amendment "is not enough."  <u>Saucier</u>, 533 U.S. at 202.

If the law is determined to be clearly established, the next inquiry is whether a reasonable official could have believed that the conduct was lawful.  <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 871-72 (9th Cir. 1993).  The defendant bears the burden of establishing that his or her actions were reasonable, <u>Doe v. Petaluma City Sch. Dist.</u>, 54 F.3d 1447, 1450 (9th Cir. 1995), and the defendant's good faith or subjective belief in the legality of his or her actions is irrelevant.  <u>Alford v. Haner</u>, 333 F.3d 972, 978-79 (9th Cir. 2003).  Where there are genuine issues of fact relating to what the officer knew or did, or if a reasonable juror could find that the officer acted unreasonably, the question is appropriately for the trier of fact.  <u>Sinaloa Lake Owners Ass'n v. City of Simi Valley</u>, 70 F.3d 1095, 1099-1100 (9th Cir. 1995).

B.  Analysis

For the reasons described in Sections I and II above, the Court has found that taken in the light most favorable to Plaintiffs, the facts do not show that Officer Chinn's conduct violated Mr. David's rights under the Fourth and Fourteenth

United States District Court

For the Northern District of California

Amendments.  If Plaintiffs had raised a disputed issue of material fact as to the existence of a constitutional violation, however, Officer Chinn would still be entitled to qualified immunity.

Plaintiffs rely on <u>Deorle</u> for the proposition that it would have been clear to a reasonable officer at the time that Officer Chinn's use of force violated Mr. David's Fourth Amendment rights. In <u>Deorle</u>, a defendant police officer fired a less-lethal, lead-filled "bean-bag" round in the face of an unarmed, verbally abusive, suicidal individual who was walking with a "steady gait" in the officer's direction.  The Ninth Circuit reversed the district court's grant of qualified immunity:

> Every police officer should know that it is objectively unreasonable to shoot--even with lead shot wrapped in a cloth case--an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals.  Here, all those factors were present.  Deorle had complied with the police officers' instructions, had discarded his potential weapons whenever asked to do so, and had not assaulted anyone; in addition, a team of negotiators essential to resolving such situations was en route.

<u>Deorle</u>, 272 F.3d at 1285.  Plaintiffs correctly note that a number of factors that weighed against qualified immunity in <u>Deorle</u> were also present here, including the lack of serious offense, Mr. David's clear emotional disturbance, lack of warning about the imminent use of force, absence of flight risk and imminent arrival of trained negotiators.

However, several other factors not present in <u>Deorle</u> weigh in favor of the reasonableness of Officer Chinn's use of force.  Mr. David was clearly armed with a deadly weapon.  He failed to comply

35

United States District Court

For the Northern District of California

with Officer Chinn's repeated commends to drop the knife, and advanced toward the officers while making stabbing motions and yelling aggressively.  In addition, for the reasons explained in Section I(C) above, Officer Chinn could reasonably have believed that Mr. David posed a threat of harm to others who may have remained in the building.  These differences mean that the governmental interest at stake here was significantly higher than in <u>Deorle</u>.  It would not have been apparent to a reasonable officer that <u>Deorle</u> clearly prohibited Officer Chinn's shooting.  This conclusion is reinforced by the Ninth Circuit's subsequent decision in <u>Blanford</u> (decided after the February 18, 2004 incident), which distinguished <u>Deorle</u> on the facts.  In particular, the Ninth Circuit noted that the <u>Deorle</u> defendants had up to a half hour to observe Mr. Deorle's "generally compliant" behavior, and that they had successfully secured the house and knew that their subject posed no threat of harm to innocent bystanders.  <u>Blanford</u>, 406 F.3d at 1117.

For these reasons, the Court finds that a reasonable official would not have understood that Officer Chinn's shooting violated a clearly established right at the time of the shooting.  Accordingly, the Court grants Defendants' motion for summary adjudication of Officer Chinn's affirmative defense of qualified immunity.

IV.  Municipal Liability

Defendants also move for summary adjudication of Plaintiffs' § 1983 claims against the City of Fremont and Chief Steckler.

36

United States District Court

For the Northern District of California

A.  Applicable Law

To prevail on a § 1983 claim against a municipality, a plaintiff must show: (1) that he or she suffered a deprivation of a constitutionally protected interest; and (2) that the deprivation was caused by an official policy, custom or usage of the municipality.  Monell v. New York Dep't of Social Services, 436 U.S. 658, 690-91 (1978); see also City of Canton v. Harris, 489 U.S. 378, 390-91 (1989).  Municipal liability based on unconstitutional acts of municipal employees cannot be established on the basis of respondeat superior, but rather requires proof that the harm was caused by the policy or custom of the municipality. Monell, 436 U.S. at 694.  While the liability of municipalities does not depend upon the liability of individual officers, it is contingent on a violation of constitutional rights.  Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994), cert. denied, 515 U.S. 1159 (1995).

The inadequacy of police training can form the basis for municipal liability "only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact."  City of Canton, 489 U.S. at 388.  Such circumstances arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  Id. at 390.  Accordingly, it will not suffice "to prove that an injury or accident could have been

37

United States District Court

For the Northern District of California

avoided if an officer had [received] better or more training, sufficient to equip him to avoid the particular injury-causing conduct."  Id. at 391.

Whether a local government entity has displayed a policy of deliberate indifference is generally a question of fact for the jury.  Oviatt v. Pearce, 954 F.2d 1470, 1478 (9th Cir. 1992); Wood v. Ostrander, 879 F.2d 583, 588 n.4 (9th Cir. 1989), cert. denied, 498 U.S. 938 (1990).  However, if a plaintiff fails to introduce evidence from which a jury could infer deliberate indifference, the case may be resolved summarily.  See, e.g., Mateyko v. Felix, 924 F.2d 824, 826 (9th Cir.), cert. denied, 502 U.S. 814 (1991) (testimony that officers received only three to four hours of Taser gun training and lacked information as to the Taser's precise effect would at best support a finding of mere negligence); Merritt v. County of Los Angeles, 875 F.2d 765, 771, 771 n.10 (9th Cir. 1989) (no evidence presented that county was aware of need to train officers regarding import of conflicting VIN numbers).  In comparison, cases that have survived defense motions for summary disposition have involved training programs that were far below national standards, Reed v. Hoy, 909 F.2d 324, 331 (9th Cir. 1989), cert. denied, 501 U.S. 1250 (1991), or virtually nonexistent, Davis v. Mason County, 927 F.2d 1473, 1482-83 (9th Cir.), cert. denied, 502 U.S. 899 (1991) (judgment for plaintiff as a matter of law).

The Court has already found that no disputed issue of fact exists as to whether Mr. David suffered a deprivation of a constitutionally protected interest.  See Sections I and II above. Even if the Court had found that Mr. David may have been deprived

of a constitutional right, however, it would still find in
Defendants' favor on the Monell claims.

As evidence that the City of Fremont was deliberately
indifferent to Mr. David's constitutional rights by (1) adopting a
policy and practice of unlawful shooting and (2) failing to train
officers to refrain from shooting, Plaintiffs point to Fremont's
failure to take special investigative action or provide
supplemental training despite an allegedly high number of officer-
involved shootings, largely of mentally disturbed individuals.
Plaintiffs also argue that the existence of a policy and practice
of unlawful shooting can be inferred from the FPD Review Board's
conclusions approving of Officer Chinn's conduct during the
February 18, 2004 incident; Captain Lucero and Captain Nelson's
testimony approving of those conclusions; and Captain Lucero's
determination, in requesting consideration by the Training Review
Board, that Officer Chinn's shooting of Mr. David was "necessary
and appropriate."

The Court finds that the evidence proffered by Plaintiffs
regarding other shooting incidents and the FPD's response (or lack
thereof) fails to raise a dispute of material fact as to whether
the municipality has a policy or practice of indifference to
shootings by officers.  Plaintiffs offer very little evidence about
the eleven other shootings by officers that occurred between 1992
and 2005.  In particular, Plaintiffs offer no evidence that would
enable a fact-finder to put that number of shootings in context,
either by comparing the number to the overall number of critical
incidents or by comparing the FPD's shooting rate to that of

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

similar municipalities with better training programs.  For few of the incidents do Plaintiffs show any evidence from which a trier of fact could conclude that the shootings were negligent, reckless, intentional or otherwise warranted discipline.  Nor do Plaintiffs rebut Captain Lucero's testimony that the number of incidents is relatively small and that the dearth of such incidents between May, 1999 and July, 2002 was the result of good fortune rather than a specific effect of the 1999 training.

Plaintiffs rely on the reported decision in <u>Adams</u> for the proposition that the City of Fremont was on notice that its training was inadequate, as of the jury's 1996 findings.  However, the <u>Adams</u> incident is not sufficient, in itself, to allow a jury to infer that the FPD failed properly to train.  Furthermore, it was after <u>Adams</u> that the FPD offered the two 1999 trainings on "suicide by cop" and "handling of the mentally ill," which Plaintiffs now argue should have been repeated.  Plaintiffs do not offer any evidence rebutting Captain Nelson's testimony that subsequent officer training, including the training in which Officer Chinn participated, covered at least some of the same concepts that were presented to FPD officers in 1999.  Therefore, the Court finds that Plaintiffs have failed to offer evidence from which a reasonable fact-finder could conclude that the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that FPD policymakers can reasonably be said to have been deliberately indifferent to the needs of individuals like Mr. David by failing to train.

Likewise, the Court could not infer a policy and practice of

40

United States District Court

For the Northern District of California

deliberate indifference to shootings from Fremont's subsequent
commendation of Officer Chinn's conduct.  The Ninth Circuit has
held that the post-hoc declarations of municipal decision-makers
approving or ratifying an incident may create a triable issue of
fact as to whether that incident was in accordance with an
established policy or practice of deliberate indifference.  <u>Henry</u>
<u>v. County of Shasta</u>, 132 F.3d 512, 519-20 (9th Cir. 1997), <u>amended</u>,
137 F.3d 1372 (1998).  Here, however, the undisputed facts show
that the incident in question did not involve a constitutional
violation.  Moreover, despite FPD officials' commendation of
Officer Chinn, the Review Board report included some criticism, and
was not a wholesale ratification of his tactics.  Therefore, the
Court grants Defendants' motion for summary adjudication of
Plaintiffs' <u>Monell</u> claims against the City of Fremont.

     For the same reasons, the Court grants Defendants' motion for
summary adjudication of Plaintiffs' claims against Chief Steckler
in his individual capacity.  In addition, just as the Court has
concluded that a reasonable officer would not have understood that
Officer Chinn's conduct violated a clearly established right, the
Court finds that a reasonable police chief in Chief Steckler's
position would not realize that approval or failure to discipline
Officer Chinn was unconstitutional.  Therefore, the Court grants
the motion for summary adjudication of Chief Steckler's affirmative
defense of qualified immunity.

V.   State Law Claims

     Plaintiff Jennifer David brings State law claims, for
violation of State civil rights under California Code of Civil

41

United States District Court

For the Northern District of California

Procedure § 52.1 against Officer Chinn, and for intentional and negligent wrongful death under California Code of Civil Procedure § 377.60 against all Defendants.  Plaintiffs Rachel David and M.D. bring State law claims for negligent infliction of emotional distress against Officer Chinn, for violation of State civil rights under California Code of Civil Procedure § 52.1 against Officer Chinn, for negligent wrongful death against all Defendants and for negligent hiring, retention, training, supervision and discipline against Defendants City of Fremont and Chief Steckler.

Defendants move for summary adjudication that (1) Officer Chinn's use of deadly force was objectively reasonable and privileged; (2) Officer Chinn's pre-shooting tactics were not negligent; (3) Defendants are entitled to good faith immunity from Plaintiffs' State law claims; (4) Mr. David's State civil rights were not violated; and (5) Plaintiffs Rachel David and M.D.'s claims for negligent hiring, retention, training, discipline and supervision are meritless.

Plaintiffs appear to oppose the motion only with respect to the State law claims against Officer Chinn and the issue of good faith immunity.

A.  State Civil Rights Claims

Defendants argue that they are entitled to summary adjudication of Plaintiffs' claims for violation of State civil rights because Officer Chinn's use of force was reasonable.  Claims of excessive force under California law are analyzed under the Fourth Amendment's standard of objective reasonableness, viewed from the perspective of an officer on the scene.  In re Joseph F.,

United States District Court

For the Northern District of California

85 Cal. App. 4th 975, 989 (2000) (citing <u>Martinez v. County of Los Angeles</u>, 47 Cal. App. 4th 334, 343 (1996)).  For the reasons described in Section I, the Court finds that Officer Chinn's use of deadly force was reasonable.  Therefore, the Court grants Defendants' motion for summary adjudication of Plaintiffs' State civil rights claims.

B.  Negligence Claims

Defendants argue that Officer Chinn owed Mr. David no legal duty of care, and thus Plaintiffs cannot establish any claim of negligence based on Officer Chinn's pre-shooting acts.

Factors which are to be considered in deciding "whether a particular defendant owed a tort duty to a given plaintiff" include

> (1) the foreseeablility of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability.  Where a public entity is involved, the court considers the following additional factors: the availability, cost, and prevalence of insurance for the risk involved; the extent of the agency's powers; the role imposed on it by law; and the limitations imposed on it by budget.

<u>Adams</u>, 68 Cal. App. 4th at 267-68 (internal citations omitted) (citing <u>Rowland v. Christian</u>, 69 Cal. 2d 108, 112-113 (1968) and <u>Thompson v. County of Alameda</u>, 27 Cal. 3d 741, 750 (1980)).  In <u>Adams</u>, the court applied these factors and held that law enforcement officers have no duty to take reasonable steps to prevent a threatened suicide.  <u>Id.</u> at 288.  The same California appellate court later clarified that not only do police officers have no duty to prevent suicide, they cannot be held liable for

43

United States District Court

For the Northern District of California

their negligent handling of a threatened suicide.  See Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1097-98 (2004) (holding that defendant police officers could not be held liable in tort for alleged errors such as failure to set a perimeter, getting to close to suicidal individual, failing to confirm relevant facts, failing to use a hostage negotiator or drawing a weapon while talking to suicidal individual).  However, police officers do have "a duty to use reasonable care in employing deadly force."  Id. at 1101.

Officer Chinn owed Mr. David a duty to use reasonable care when employing deadly force against him.  However, the Court has found that Officer Chinn's use of force was reasonable under the Fourth Amendment, and California courts apply this same standard in evaluating a tort claim based on an officer's allegedly negligent use of deadly force.  See id. at 1102-1106.  Therefore, the Court grants Defendants' motion for summary judgment with respect to Officer Chinn's alleged negligence.[7]

C.  State Law Immunity

California Government Code § 820.2 provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise

_____

[7]Public entities and employers also cannot be held liable in tort for negligence except where there is a specific statute declaring them to be liable or creating a specific duty of care. Munoz, 120 Cal. App. 4th at 1112 (quoting Eastburn v. Reg'l Fire Prot. Auth., 31 Cal. 4th 1175 (2003)).  The court in Munoz found no such basis for a public entity's duty in circumstances similar to those here, and Plaintiffs have identified none.  Id. at 1113. Therefore, the Court grants Defendants' motion for summary adjudication of Plaintiffs' claims for negligent wrongful death and negligent hiring, retention, training, supervision and discipline against Defendants City of Fremont and Chief Steckler.

44

**United States District Court**

For the Northern District of California

of the discretion vested in him, whether or not such discretion be abused."  Government Code § 815.2 likewise provides that a "public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

Under California law, a police officer is entitled to immunity under § 820.2 if circumstances reasonably created fear of death or serious bodily harm to the officer or another.  <u>Martinez v. County of Los Angeles</u>, 47 Cal. App. 4th 334, 349 (1996) (quoting <u>Kortum v. Alkire</u>, 69 Cal. App. 3d 325, 333 (1977)).  The standard is the same as that used to evaluate the reasonableness of use of force under the Fourth Amendment.  <u>Id.</u> (citing <u>People v. Rivera</u>, 8 Cal. App. 4th 1000, 1007 (1992)).

Again, the Court has already found that Officer Chinn acted reasonably in using deadly force against Mr. David.  Therefore, Officer Chinn is entitled to immunity under § 815.2 for any claim arising from Mr. David's death.  The City of Fremont and Chief Steckeler are likewise entitled to immunity under § 820.2 for all remaining State law claims.

CONCLUSION

For foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (Docket No. 32).  Defendants shall recover their costs from Plaintiffs.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 7/31/06

_____
CLAUDIA WILKEN
United States District Judge

45